David C. Powell (SBN 129781)
Eric G. Wallis (SBN 67926)
REED SMITH LLP
Two Embarcadero Center
Suite 2000
San Francisco, CA  94111
**Mailing Address:**
P. O. Box 7936
San Francisco, CA  94120-7936
Telephone:     +1 415 543 8700
Facsimile:      +1 415 391 8269

Thomas O. Jacob (SBN 125665)
Office of General Counsel
Wells Fargo & Co.
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Telephone:     +1 415-396-4425
Facsimile:      +1 415-975-7864

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| NATHALIE AL-THANI, | No. CV 08-1745 CW |
| Plaintiff, | **DEFENDANTS' AMENDED MOTION TO COMPEL ARBITRATION, SUPPORTING MEMORANDUM, AND DECLARATION OF ERIC G. WALLIS** |
| vs. | |
| WELLS FARGO & COMPANY, WELLS FARGO INVESTMENTS, LLC, SHALOM MORGAN, DAN HILKEN, and ANDREY MOVSESYAN, | Date:            August 28, 2008<br>Time:            2:00 p.m.<br>Courtroom:    2 |
| Defendants. | Attached Documents:     Exhibits A & B to Wallis Declaration |
| | Honorable Claudia Wilken |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DOCSOAK-9910233.2

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION TO COMPEL ARBITRATION ...................................................................1

MEMORANDUM SUPPORTING MOTION TO COMPEL ARBITRATION ..............................1

I    PRELIMINARY STATEMENT ...........................................................................................1

II   FACTUAL BACKGROUND ...............................................................................................2

    A.    In January 2008 Plaintiff Signed an Agreement Promising to Arbitrate Disputes with these Defendants ...........................................................................2

        1.    Plaintiff Opened a Brokerage Account with WFI and Purchased Securities .....................................................................................................2

        2.    In January 2008 Plaintiff Signed the Agreement and Promised to Arbitrate Disputes with these Defendants ...............................................3

    B.    In February 2008 a Dispute Arose over Plaintiff's Purchase of AMPS that She Refuses to Arbitrate Despite Demand .............................................4

    C.    Summary of Argument ........................................................................................5

III  LEGAL ANALYSIS ............................................................................................................5

    A.    Authority For Motion ..........................................................................................5

    B.    The Requisites for Granting the Motion Exist ....................................................6

        1.    Requirements for Granting a Motion to Compel Arbitration .........................6

        2.    No Plausible Claim for "Fraud in the Inception" Exists .................................6

            a.    A Written Arbitration Agreement Exists Between Plaintiff and the Moving Defendants ........................................6

            b.    Under California Law Plaintiff's Alleged Failure to Read the Acknowledgment or the full Agreement Does Not Bar Enforcement of the Arbitration Provision ......................................7

            c.    Morgan Had No Duty to Point Out and Explain the Arbitration Provision to Plaintiff ........................................................8

    C.    The Action Should be Stayed Pending Arbitration ............................................11

IV   CONCLUSION ....................................................................................................................11

DECLARATION OF ERIC G. WALLIS .......................................................................................12

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

- i -

DOCSOAK-9910233.2

Defendants' Amended Motion To Compel Arbitration, Supporting Memo. & Dec. of Eric Wallis
Al-Thani v. Wells Fargo &Company, et al. – No. CV 08-1745

# TABLE OF AUTHORITIES

## CASES

*Allen v. Todd,*
  12 Cal. App. 3d 654, 90 Cal. Rptr. 807 (1970) ................................................ 9

*Caravan Mobile Home Sales, Inc. v. Lehman Brothers Kuhn Loeb, Inc.,*
  769 F.2d 561 (9th Cir. 1985) ....................................................................... 10

*Circuit City Stores, Inc. v. Adams,*
  279 F.3d 889 (9th Cir.), <u>cert. denied</u>, 535 U.S. 1112 (2002) ............................. 7

*Cohen v. Wedbush, Noble & Cooke, Inc.,*
  841 F.2d 282 (9th Cir. 1988), <u>overruled on other grounds</u>, *Ticknor v. Choice Hotels,
  Inc.*, 265 F.3d 931 (9th Cir. 2001), <u>cert. denied</u>, 534 U.S. 1133 (2002).................. 9

*Duffy v. Cavalier,*
  215 Cal. App. 3d 1517, 264 Cal. Rptr. 740 (1990) ........................................... 9

*E.A. Strout Western Realty v. Gregoire,*
  101 Cal. App. 2d 512, 225 P.2d 585 (1950) ................................................... 10

*Gutierrez v. Academy Corp.,*
  967 F.Supp. 945 (S.D. Tex. 1997) .............................................................. 11

*Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  461 F. Supp. 951 (E.D. Mich. 1978), <u>aff'd without opinion</u>, 647 F.2d 165 (6th Cir.
  1981) ................................................................................................. 10

*Macaulay v. Norlander,*
  12 Cal.App.4th 1, 15 Cal.Rptr.2d 204 (1992) ................................................ 7

*Olmstead v. Dell, Inc.,*
  473 F.Supp.2d 1018 (N.D. Cal. 2007) .......................................................... 7

*Price v. Wells Fargo Bank,*
  213 Cal.App.3d 465, 261 Cal.Rptr. 735 (1991) .............................................. 9

*Rhode v. Bartholomew,*
  94 Cal. App. 2d 272, 210 P.2d 768 (1949) .................................................... 9

*Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  337 F. Supp. 107 (N.D. Ala. 1971), <u>aff'd</u>, 453 F.2d 417 (5th Cir. 1972)............... 10

*Rosenthal v. Great Western Financial Securities Corp.,*
  14 Cal.4th 394, 58 Cal.Rptr.2d 875 (1996).................................................. 7, 9

*Stern v. Cingular Wireless Corp.,*
  453 F.Supp.2d 1138 (C.D. Cal. 2006) .......................................................... 6

*Stewart v. Preston Pipeline Inc.,*
  134 Cal.App.4th 1565, 36 Cal.Rptr.3d 901 (2005) ........................................ 6, 7

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

DOCSOAK-9910233.2

*Vai v. Bank of America,*
    56 Cal. 2d 329, 15 Cal.Rptr. 71 (1961) ............................................................ 10

*Wolschlager v. Fidelity National Title Insurance Co.,*
    111 Cal.App.4th 784, 4 Cal.Rptr.3d 179 (2003) ............................................... 6

## STATUTES

9 U.S.C. Section 1 *et seq* ..................................................................................... 5

9 U.S.C. Section 3 ........................................................................................... 6, 11

9 U.S.C. Section 4 ................................................................................................. 5

Cal. Civ. Code § 2355 ......................................................................................... 10

## TEXTS

12 Am. Jur. 2d (1997) ........................................................................................... 9

Restatement (2d), Agency, (1957) ...................................................................... 10

*Weiss, A Review of the Historic Foundations of Broker-Dealer Liability for Breach of
    Fiduciary Duty,* 23 J. Corp. L. 65 (1997) ......................................................... 10

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOCSOAK-9910233.2

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION TO COMPEL ARBITRATION**

On August 28, 2008 at 2:00 p.m. in Courtroom 2 Defendants Wells Fargo Investments, LLC (WFI), Shalom Morgan (Morgan), Andrey Movsesyan (Movsesyan) and Dan Hilken (Hilken) will move the Court for an order as follows.

(1) Granting Defendants' motion to compel arbitration and ordering Plaintiff Nathalie Al-Thani (Plaintiff) to submit her claims herein to arbitration under the auspices of the Financial Industry Regulatory Authority, Inc. (FINRA), and (2) staying proceedings in this action pending arbitration.

This motion will be made on the grounds that Plaintiff entered a written agreement with these Defendants to arbitrate disputes and that the claims in Plaintiff's First Amended Complaint (FAC) are subject to arbitration.  The motion will be made and based on this Notice, the attached Memorandum and Declaration of Eric G. Wallis, the accompanying Declaration of Shalom Morgan, and the files and pleadings in this case.

**MEMORANDUM SUPPORTING MOTION TO COMPEL ARBITRATION**

**I**

**PRELIMINARY STATEMENT**

Plaintiff signed a brokerage account agreement with WFI that contained a provision requiring arbitration of disputes arising between them.  Notwithstanding that promise, Plaintiff filed the FAC herein raising claims that are clearly subject to the arbitration provision, and refused to arbitrate them simply because she did not read the agreement's arbitration provision.  Because her failure to do so is not grounds for revoking the arbitration agreement, the Court should grant Defendants' motion to compel arbitration and stay these proceedings pending that arbitration.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## II

### FACTUAL BACKGROUND

**A.    In January 2008 Plaintiff Signed an Agreement Promising to Arbitrate Disputes with these Defendants**

**1.    Plaintiff Opened a Brokerage Account with WFI and Purchased Securities**

In January 2008 Plaintiff deposited $1,750,000 into a bank account with nonparty Wells Fargo Bank (the Bank). After she advised a Bank teller that she was not interested in using those funds to acquire a certificate of deposit from the Bank, the teller referred her to Morgan, a financial advisor with WFI in its 1900 Union Street, San Francisco office. FAC, ¶¶6 & 10-12; accompanying Declaration of Shalom Morgan (Morgan Dec.), ¶1.

Morgan and Plaintiff met on Friday, January 11, 2008 and discussed possible investments including auction rate securities (ARS).[1] Morgan Dec., ¶¶ 2-5. During the conversation Morgan gave Plaintiff a copy of WFI's Brokerage Account Agreement (Agreement). *Id.*, ¶4 & Exh. A. Plaintiff agreed to open an account, but left the WFI offices before she signed the Agreement. *Id.*, ¶5. Morgan then electronically established an account for Plaintiff with WFI (no. 45091942) and, per Plaintiff's instructions, transferred $1,750,000 from Plaintiff's account with the Bank into her WFI account. Morgan Dec., ¶6. The account was nondiscretionary, so Morgan did not have the authority to purchase securities for Plaintiff despite having the funds in the WFI account. *Id.*

---

[1] ARS were developed in the mid-1980s. They are debt securities (bonds or preferred stock) with long-term maturities (usually twenty or thirty years) for which the interest rates (in the case of bond) or dividend yields (for preferred stock) are periodically reset through "Dutch auctions" every seven to 35 days depending upon the specific issue. Securities & Exchange Commission Administrative Proceeding Release No. 33-8684 at 3 (May 31, 2006). Because the auctions resulted in yields that were slightly higher than traditional money market rates but lower than long-term bond yields issuers – often municipalities or closed-end mutual funds – were able to borrow long-term money at short-term rates.

During the week of January 14, 2008 Plaintiff and Morgan continued their conversations about possible investments, and Plaintiff decided to purchase $1,750,000 worth of a form of ARS known as "auction market preferred shares" (AMPS) issued in 2004 by a closed-end mutual fund managed by Neuberger Berman. The sale occurred January 17, 2008. Morgan Dec., ¶ 7; FAC, ¶17.

**2.    In January 2008 Plaintiff Signed the Agreement and Promised to Arbitrate Disputes with these Defendants**

During conversations the week of January 14, Morgan told Plaintiff that she needed to sign the Agreement to have an account with WFI. Morgan Dec., ¶ 8. Plaintiff was unable to visit the WFI offices again until January 23, 2008, however. *Id.*, ¶ 9. At that time Plaintiff sat down at Morgan's desk, and he handed her the Acknowledgement (last) page of the Agreement. *Id.*, ¶9 & Exh. B.

The Acknowledgement is titled "Client Acknowledgement/Agreement." The right hand corner states "PLEASE READ AND SIGN." The Acknowledgement states that "I/We {Plaintiff} understand and agree to the following:

> 1.    I/We have read and understand the terms and conditions of the Brokerage Account Agreement and I/we agree to be bound by them.

The footer below the signature line states, "WFI Brokerage Account Agreement." Above the signature line the following appears:

> 5.    BY SIGNING BELOW, I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THE WELLS FARGO INVESTMENTS BROKERAGE ACCOUNT AGREEMENT WHICH CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE IN SECTION 15, PAGE 3.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DOCSOAK-9910233.2

Morgan advised Plaintiff that she needed to sign the Agreement. Morgan Dec., ¶9; FAC, ¶104. Plaintiff did not ask any questions about the Agreement, nor did she request a full copy of the Agreement (which previously she had been handed), and left shortly after signing. Morgan Dec., *id.*

The arbitration provision referenced in the Agreement provides in relevant part:

> THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE. BY SIGNING AN ARBITRATION AGREEMENT THE PARTIES AGREE AS FOLLOWS . . . I AGREE THAT ALL CLAIMS, CONTROVERSIES, AND OTHER DISPUTES BETWEEN ME AND WELLS FARGO INVESTMENTS AND ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, OR AGENTS ARISING OUT OF OR RELATING TO THE BROKERAGE ACCOUNT OR ANY ORDERS OR TRANSACTIONS THEREIN . . . WHETHER ENTERED INTO BEFORE, ON, OR AFTER THE DATE THIS ACCOUNT IS OPENED, SHALL BE DETERMINED BY ARBITRATION CONDUCTED BY, AND SUBJECT TO THE ARBITRATION RULES THEN IN EFFECT OF THE FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.

**B.    In February 2008 a Dispute Arose over Plaintiff's Purchase of AMPS that She Refuses to Arbitrate Despite Demand**

In February 2008 the market for ARS securities, including Plaintiff's AMPS, suddenly evaporated. FAC, ¶19-22, 25 & 30. Unhappy with WFI's inability to find a buyer for the AMPS, Plaintiff filed the Complaint on April 1, 2008 naming WFI, Morgan, two other WFI employees Movsesyan[2] and Hilken[3], and Wells Fargo & Company (WFC), the alleged parent corporation of WFI.

---

[2] The FAC states that the purchase confirmation slip contained the names of both Morgan and Movsesyan and that due to this listing, and **not** any alleged wrongdoing by Movsesyan, he has been sued. FAC, ¶¶ 8 & 77.

[3] The FAC does not allege that Hilken made any misstatements to Plaintiff or otherwise acted wrongfully.

DOCSOAK-9910233.2

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

On April 30, 2008 Defendants' counsel demanded arbitration on behalf of WFI, Morgan, Movsesyan and Hilken pursuant the Agreement's arbitration provision in a letter to Plaintiff's counsel that enclosed a copy of the Agreement.  Attached Declaration of Eric G. Wallis, ¶ 2 & Exhibit A.  On May 12 Plaintiff responded by: (1) refusing to arbitrate (*id.*, ¶ 3 & Exh. B), and (2) filing the FAC.  The FAC added, as a Fourteenth Claim, her defense to arbitration – that Morgan's failure to specifically point out the arbitration provision in the Agreement and provide a legal opinion on its meaning and consequences rendered the arbitration provision unenforceable due to "fraud."  FAC, ¶¶ 104-06.  This motion to compel then became necessary.

## C.    Summary of Argument

Plaintiff admits signing the Agreement on January 23, 2008.  Without question the FAC falls within the Agreement's arbitration provision.   Plaintiff's contention that the arbitration provision is revocable due to Morgan's "fraud" in failing to direct her attention to it is contrary to law.  The motion to compel should be granted and the action stayed pending arbitration.

## III

## LEGAL ANALYSIS

## A.    Authority For Motion

Section 4 of the Federal Arbitration Act[4], 9 U.S.C. Section 4, provides statutory authority for this motion to compel:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that

---

[4] 9 U.S.C. Section 1 *et seq.*

DOCSOAK-9910233.2

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  such arbitration proceed in the manner provided for in such
2  agreement.

3  Section 3 of the FAA provides authority for staying this action pending arbitration:

4  If any suit or proceeding be brought in any of the courts of the United
   States upon any issue referable to arbitration under an agreement in
5  writing for such arbitration, the court in which such suit is pending,
   upon being satisfied that the issue involved in such suit or proceeding
6  is referable to arbitration under such an agreement, shall on
   application of one of the parties stay the trial of the action until such
7  arbitration has been had in accordance with the terms of the
   agreement…

8

9  **B.    The Requisites for Granting the Motion Exist**

10       **1.    Requirements for Granting a Motion to Compel Arbitration**

11

12  A court must grant a motion under the FAA to compel arbitration if two requisites exist: (1)

13  a valid arbitration agreement and (2) the dispute falls within its terms. *Stern v. Cingular Wireless*

14  *Corp.*, 453 F.Supp.2d 1138, 1143 (C.D. Cal. 2006).

15

16  There is no dispute that the second element exists - clearly Plaintiff's allegations that the

17  AMPS purchases were induced by Morgan's fraud or negligence is a "dispute" between Plaintiff

18  and these Defendants "arising out of or relating to the brokerage account or any orders or

19  transactions therein . . . ."  No genuine dispute exists whether the arbitration provision is valid.

20

21       **2.    No Plausible Claim for "Fraud in the Inception" Exists**

22            **a.    A Written Arbitration Agreement Exists Between Plaintiff and the**

23            **Moving Defendants**

24

25  Plaintiff's FAC concedes that she executed the Agreement's Acknowledgement (FAC, ¶

26  104); by doing she – as the Acknowledgement **expressly states** - assented to its terms.[5]  *Stewart v.*

27  _____
   [5] That is true if the Acknowledgement is considered a separate contract – by expressly stating that it included the terms
28  of the Agreement a valid incorporation by reference occurred.  E.g., *Wolschlager v. Fidelity Nat'l Title Ins. Co.*, 111

1    *Preston Pipeline Inc.*, 134 Cal.App.4th 1565, 1587, 36 Cal.Rptr.3d 901 (2005).   Those terms

2    include, of course, the arbitration provision set forth in Section 15.

3

4    Plaintiff's defense is that she was unaware the Agreement contained an arbitration

5    provision due to "fraud in the inception" and is therefore void *ab initio*.   She claims the fraud

6    occurred because:   (1) she did not read the Acknowledgement page or the Agreement and (2)

7    Morgan failed to specifically to call the arbitration provision to her attention.   See FAC, ¶¶ 106-07.

8    But plainly neither contention creates a valid ground to refuse arbitration.

9

10    **b.    Under California Law[6] Plaintiff's Alleged Failure to Read the**

11    **Acknowledgment or the full Agreement Does Not Bar Enforcement of**

12    **the Arbitration Provision**

13

14    Because a party's signing a contract manifests assent to its terms, that party's failure to

15    actually read the contract's contents is not a defense to enforcement of its terms.   *Stewart*, 134

16    Cal.App.4th at 1588-89.   This basic principle of contract law applies when the term at issue is an

17    arbitration clause.   *Macaulay v. Norlander*, 12 Cal.App.4th 1, 6, 15 Cal.Rptr.2d 204 (1992).

18    Plaintiff's neglect to read the Acknowledgement and request a copy of the Agreement referenced

19    therein thus creates no basis for revoking the arbitration provision.   *Id.*

20

21    This general principle is, of course, subject to an exception for fraud that prevents a signing

22    party from becoming aware of the arbitration provision so that no contract is deemed to have

23    existed.   *Rosenthal v. Great Western Financial Securities Corp.*, 14 Cal.4th 394, 415-16, 58

24    Cal.Rptr.2d 875 (1996).   However, to deny enforcement of a written arbitration provision on

25    Cal.App.4th 784, 790-91, 4 Cal.Rptr.3d 179 (2003).

26    6 California state law applies to general contract formation defenses including fraud.   *Circuit City Stores, Inc. v.*

27    *Adams*, 279 F.3d 889, 892 (9th Cir.), <u>cert. denied</u>, 535 U.S. 1112 (2002); *Olmstead v. Dell, Inc.*, 473 F.Supp.2d 1018, 1022 (N.D. Cal. 2007).

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- 7 -                                                                                            DOCSOAK-9910233.2

grounds of "fraud in the inception" the party seeking to disavow its promise must plead and prove that the failure to discover the arbitration provision was caused by: (1) the other party's affirmative misrepresentations or active concealment of the arbitration provision and (2) the lack of a reasonable opportunity to learn the terms of the contract before signing. *Id.*, 14 Cal.4th at 423-26. Neither exists here.

First, the FAC (confirmed by Morgan's Declaration) admits that Morgan made no misstatements concerning the Acknowledgement; to the contrary, he specifically told her that it was a document related to her securities account (into which she had just invested a not-inconsiderable $1,750,000) that she needed to sign. Having handed the Acknowledgement to her (and having previously handed her a complete copy of the Agreement), and being available to answer questions concerning it, Morgan obviously did not "actively conceal" the Agreement's terms.

Second, Plaintiff had the opportunity to read the simple one-page Acknowledgement; indeed, all she had to do was lift her eyes a quarter inch above where she signed to see language, set off from the rest by its fully-capitalized letters, informing her that the Agreement contained an arbitration provision.

      c.    **Morgan Had No Duty to Point Out and Explain the Arbitration Provision to Plaintiff**

Plaintiff's last argument is that Morgan's failure to point out and explain the arbitration provision was a breach of his "fiduciary duty" that constituted fraud by "preventing her" from

DOCSOAK-9910233.2

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   being aware of the arbitration provision that she would not have otherwise agreed to.[7]   That

2   argument is without merit.

3

4        The California Supreme Court has held that a stock broker does not have a "fiduciary

5   obligation" to point out and explain an arbitration provision in an account agreement.  *Rosenthal*,

6   14 Cal.4[th] at 425-26 (citing cases).  This is consistent with the great weight of authority, including

7   that in the Ninth Circuit.  *Cohen v. Wedbush, Noble & Cooke, Inc.*, 841 F.2d 282, 287 (9th Cir.

8   1988), <u>overruled on other grounds</u>, *Ticknor v. Choice Hotels, Inc.*, 265 F.3d 931 (9th Cir. 2001),

9   <u>cert. denied</u>, 534 U.S. 1133 (2002).  This principle applies even where, as here, the contract was

10  signed after a transaction occurred (i.e., the AMPS purchase on January 17).

11

12       When a stock broker buys and sells stock for another, the broker acts as an agent.  *Allen v.*

13  *Todd*, 12 Cal. App. 3d 654, 658, 90 Cal. Rptr. 807 (1970).  California law recognizes that a

14  broker's duties are derived from that agency relationship.  E.g., *Duffy v. Cavalier*, 215 Cal. App. 3d

15  1517, 1534, 264 Cal. Rptr. 740 (1990).

16

17       A stock broker is considered a special, rather than a general, agent because the broker is

18  hired to perform a specific transaction or task – that is, to buy and sell securities.  *Rhode v.*

19  *Bartholomew*, 94 Cal. App. 2d 272, 278, 210 P.2d 768 (1949).  Thus:

20

21           A broker is distinguishable from an agent generally by reason of the
            fact that his authority is of a **special and limited** character in most
22          respects...   A broker is also distinguishable from an agent in that a
            broker sustains no fixed and permanent employment by, or relation
23          to, any principal, but holds himself out for employment by the public
            generally, his employment in each instance being that of a special
24          agent for a single object . . . .
            [12 Am. Jur. 2d, <u>Brokers</u>, § 3 at p. 635 (1997) (emphasis added).]
25

26  ─────────────────
    [7] Defendants note that any assertion Plaintiff's "fiduciary relationship" was based, in part, on her existing business
27  relationship with the Bank is meritless – the relationship between a bank and its depositor is that of debtor-creditor, not
    fiduciary-beneficiary.  E.g., *Price v. Wells Fargo Bank*, 213 Cal.App.3d 465, 476, 261 Cal.Rptr. 735 (1991).
28

Defendants' Amended Motion To Compel Arbitration, Supporting Memo. & Dec. of Eric Wallis
Al-Thani v. Wells Fargo &Company, et al. – No. CV 08-1745

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    Consequently, once the task a broker is employed to perform is completed – e.g., buying or

2    selling a security – the agency, and the broker's authority and duty, terminates.  See Cal. Civ. Code

3    § 2355; *E.A. Strout Western Realty v. Gregoire*, 101 Cal. App. 2d 512, 519, 225 P.2d 585 (1950);

4    Restatement (2d), Agency, § 386 (1957).  This is consistent with the general rule that because a

5    fiduciary relationship requires control by the fiduciary over the other's property [see *Vai v. Bank of*

6    *America*, 56 Cal. 2d 329, 338, 15 Cal.Rptr. 71 (1961)], termination of control – e.g., completion of

7    the transaction - ends the fiduciary relationship.

8

9    Plaintiff's WFI account was nondiscretionary.   Morgan Dec., ¶6; see generally *Leib v.*

10    *Merrill Lynch, Pierce, Fenner & Smith*, Inc., 461 F. Supp. 951, 953-54 (E.D. Mich. 1978), aff'd

11    without opinion, 647 F.2d 165 (6th Cir. 1981).   Morgan's authority to act for, and duties to,

12    Plaintiff thus ended with the execution of the AMPS buy order.  *Leib*, 461 F. Supp. at 955-56;

13    accord *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 769 F.2d 561, 567 (9th

14    Cir. 1985); *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F. Supp. 107, 111 (N.D.

15    Ala. 1971), aff'd, 453 F.2d 417 (5th Cir. 1972).  As one commentator stated, "In a nondiscretionary

16    account, the relationship of agency, and any duties attached, ends when each transaction is

17    completed. . . ."  Weiss, A Review of the Historic Foundations of Broker-Dealer Liability for

18    Breach of Fiduciary Duty, 23 J. Corp. L. 65, 111 (1997).

19

20    When Plaintiff signed the Acknowledgement the "task" Morgan had been hired for – to

21    purchase the AMPS – had already been completed.[8]  Thus, his agency had been concluded, and no

22    fiduciary relationship between himself and Plaintiff existed when the Acknowledgment was

23    presented.  Even under Plaintiff's "fiduciary duty" theory, therefore, her argument fails.

24

25

26

27    [8] It is undisputed that when Plaintiff signed the Acknowledgement she had not given Morgan any order to sell her AMPS; thus, no agency relationship existed for that non-existent sell order.

28

- 10 -                                DOCSOAK-9910233.2

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1

**C.    The Action Should be Stayed Pending Arbitration**

2

3    9 U.S.C. Section 3 requires that when arbitration is ordered the court must issue an order

4  staying proceedings on the claims referred to arbitration.  *Gutierrez v. Academy Corp.*, 967 F.Supp.

5  945, 947 (S.D. Tex. 1997).  Consequently, concurrent with granting the notion to compel this

6  action should be stayed against these Defendants pending arbitration.

7

8    **IV**

9    **CONCLUSION**

10

11    Plaintiff signed an agreement promising to arbitrate the disputes at bar.  Her claim that she

12  did not read the arbitration provision because Morgan did not expressly point it out to her does not

13  create even a potentially viable defense to enforcement of the arbitration agreement.  Accordingly,

14  the motion to compel arbitration should be granted and this action stayed as to these Defendants

15  pending arbitration.

16

17    DATED:  June 10, 2008.

18    REED SMITH LLP

19

20    By____/s/_____
          Eric G. Wallis
21          Attorneys for Defendants

22

23

24

25

26

27

28

- 11 -                                                    DOCSOAK-9910233.2

Defendants' Amended Motion To Compel Arbitration, Supporting Memo. & Dec. of Eric Wallis
Al-Thani v. Wells Fargo &Company, et al. – No. CV 08-1745

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1

## DECLARATION OF ERIC G. WALLIS

2

3      I, Eric G. Wallis, say:

4

5      1.      I am a partner of the law firm of Reed Smith LLP, attorneys for Defendants.

6

7      2.      On April 30, 2008 I sent to Plaintiff's counsel a written demand that she agree to

8   arbitrate her claims against these moving Defendants, a true copy of which is attached Exhibit A.

9

10     3.      On May 12, 2008 I received a response to my April 30 arbitration demand, a true

11  copy of which is attached Exhibit B, in which Plaintiff refused to agree to arbitrate her claims.

12

13     Signed at Oakland, California on June 10, 2008.  I declare under penalty of perjury under

14  the laws of the United States that the foregoing is true and correct.

15

16                                          _____/s/_____
                                              Eric G. Wallis

17

18

19

20

21

22

23

24

25

26

27

28

- 12 -                                                    DOCSOAK-9910233.2

Defendants' Amended Motion To Compel Arbitration, Supporting Memo. & Dec. of Eric Wallis
Al-Thani v. Wells Fargo &Company, et al. – No. CV 08-1745

# EXHIBIT A

**Al-Thani v. Wells Fargo & Company, et al.**
**No. CV 08-1745 CW**
**Declaration of Eric G. Wallis re**
**Defendant Wells Fargo's Amended Motion To Compel Arbitration**

# ReedSmith

Eric G. Wallis
Direct Phone: 510.466.6754
Email: ewallis@reedsmith.com

Reed Smith LLP
1999 Harrison Street
Suite 2400
Oakland, CA 94612-3572
+1 510 763 2000
Fax +1 510 273 8832
www.reedsmith.com

April 30, 2008

**Via Facsimile**
**Via UPS**

Mark P. Meuser
Hassan Law Firm
1801 Bush Street, Suite 304
San Francisco, CA 94109

**Al-Thani v. Wells Fargo & Company, et al.**
**U.S.D.C. Northern District of California, Case # CV 08-1745**
**Our File No. 349334.60012**

Dear Mr. Meuser:

We represent all Defendants in this case, so please direct further communications to our office. First, Defendants will execute and return to you the service acknowledgments, so you do not need to engage a process server to effect service.

Second, enclosed please find a copy of your client's Brokerage Account Agreement and Trading Authorization that bear her signature. Clearly Ms. Al-Thani's claims are within the scope of the arbitration provisions at paragraph 15, pp. 3-4 of the Account Agreement. Please advise whether your client would stipulate to an order for arbitration of her claims against Wells Fargo Investments and the individual Defendants and avoid the cost to both sides of a formal motion to compel arbitration.

Third, we ask that you dismiss Wells Fargo & Company (WFC) as a Defendant. As the Complaint acknowledges, the securities in question were acquired through Wells Fargo Investments, a separate legal entity and not WFC. All of the alleged misstatements to induce purchase of the securities were ostensibly made by employees of Wells Fargo Investments, not WFC. That plaintiff had a bank account with Wells Fargo Bank; that Wells Fargo Investments is (according to the Complaint) a subsidiary of WFC; and that a teller at Wells Fargo Bank allegedly referred plaintiff to a Wells Fargo Investment advisor does not, of course, render WFC liable for investments made through a separate corporation.

**EXHIBIT A**

Mark P. Meuser
April 30, 2008
Page 2

**ReedSmith**

I will be out of state until May 12.  When I return I would be happy to discuss the above issues with you to resolve them.

Very truly yours,

Eric G. Wallis

EGW:mha

Enclosures

DOCSOAK-9907154.2

03/12/2008    PAGE 1/5 * RCVD AT 3/12/2008 1:24:22 PM [Central Daylight Time] * SVR:JIS931I1RFCOL1/4 * DNIS:3175 * CSID:4153962205 * DURATION (mm-ss):02-52



# Trading Authorization
### Third Party Authorization and
### Power of Attorney Instructions

If the client wishes to authorize another party to transact business in the client's account, that party must be authorized to do so in writing by the client. The authorization can be given either with the firm's trading authorization form or with a general outside power of attorney ("Outside POA") from the client. However, the firm's trading authorization form should be used unless there are reasonable grounds for accepting an Outside POA. (See below for exceptions.)

**Definitions**

**Attorney-In-Fact:** A person authorized by another to act in his or her place and stead, either for some particular purpose or for business in general.

**Agent:** An attorney-in-fact.

**Durable Power of Attorney:** A power of attorney that does not terminate upon the incompetence or incapacity of the principal.

**Principal:** The person granting authority to another party to act on his or her behalf.

**Power of Attorney:** A written document authorizing one person to act for another. It can be general or specific.

**Trading Authorizations:** A limited, specific form of a power of attorney that can only be used for the purpose and the circumstances indicated.

**A. Trading Authorization Form**

The Trading Authorization Form ("TA Form") must be used when a client wishes to authorize another individual ("Agent") to trade or otherwise transact business in the client's brokerage account. The TA Form grants a power of attorney to the Agent named by the client. The TA Form can either grant Limited Trading Authorization ("LTA") or Full Trading Authorization ("FTA"). Either the LTA or FTA may be Durable, meaning that it will continue in effect upon the incompetence, incapacity or disability of the client. In all cases, the TA terminates upon the death of the client.

The fully completed, signed, and notarized form must be forwarded to your RSM, Operations Manager, or Branch Administration Manager for review and approval. Upon approval, the Financial Consultant will be notified that he/she may accept instructions from the Agent.

**B. Outside Power of Attorney Form**

WFI requires that the TA Form be used to grant authorization to an Agent. However, in certain limited instances (see intranet site for reasonable grounds for exceptions), an Agent may provide a Power of Attorney previously prepared and executed by the client ("Outside POA"). In such cases, the client's Outside POA will only be accepted when accompanied by a completed and signed WFI Power of Attorney Affidavit and Indemnification Form ("POA Affidavit").

**C. Restrictions**

■ A Principal may not appoint multiple Agents on the TA Form. For joint accounts, any of the account owners wanting to appoint an Agent must complete the TA Form. The same Agent may be appointed for more than one owner of the account.

■ Generally, only an individual can be appointed as an Agent. For other appointments, contact the Ops Manager or Regional Compliance Analyst for assistance.

■ A power of attorney will not be accepted for custodial, conservatorship, guardianship, or trust and estate accounts.

■ A foreign (NRA) individual can be appointed as an Agent only if they reside in an approved WFI country.

■ A foreign (NRA) individual appointed as Agent will only be granted a non-durable Limited Trading Authorization (trading only).

■ A power of attorney terminates and no further instructions or activity is permitted by the Agent upon:

   1. In all cases upon notification of the death of the client.

   2. Notification by the client that the authorization is terminated.

   3. Upon official (court declaration or physician certification) notification that the client is incompetent when the power of attorney is non-durable.

**D. Procedures for Accepting an Outside POA**

1. If accepting the outside POA, it must be accompanied by a completed and signed POA Affidavit.

2. The Outside POA should be carefully reviewed to determine the scope of the authority that has been granted to the Agent.

3. The Outside POA should be reviewed to determine if it grants the Agent a Durable POA, in the case where the client is disabled or incompetent.

FR04027 (200702042) 07/07)

: Trading Authorization

**4. CLIENT TERMS AND CONDITIONS** (continued)

This Trading Authorization and indemnity shall continue and remain in full force and effect until I either (1) revoke it by a written notice addressed to, and received by,

WFI at MAC: N9311-136
Attn: Central New Accounts
625 Marquette Avenue S—13th Floor
Minneapolis, MN 55402

and WFI has had a reasonable time (not less than two full business days) to act thereon, or (2) it is a non-durable power of attorney and is revoked by a third party upon my subsequent mental disability, incompetence, incapacity or death, provided however, that any such revocation will not affect any liability resulting in any way from transactions initiated prior to you receiving actual notice of such revocation. This Trading Authorization is in addition to (and in no way limits or restricts) any rights WFI may have under any other agreement with me. This Trading Authorization supersedes any prior trading authorization that I may have executed with respect to my Account. This Trading Authorization and indemnity will inure to the benefit of WFI and its successors or assigns.

I have read carefully the provisions of this Trading Authorization and understand that it authorizes my Agent and Attorney-In-Fact, herein named, to exercise all rights and powers set forth above with respect to my Account, and I understand that anything my Agent may do in the exercise of such rights and powers is fully binding upon me.

**NOTICE TO PERSON EXECUTING DURABLE POWER OF ATTORNEY**

A Durable Power of Attorney is an important legal document. By signing the Durable Power of Attorney, you are authorizing another person to act for you, the Principal. Before you sign this Durable Power of Attorney, you should know these important facts:

Your Agent (Attorney-In-Fact) has no duty to act unless you and your Agent agree otherwise in writing. This document gives your Agent the powers to manage, disposed of, sell, and convey your personal property, and to use your property as security if your Agent borrows money on your behalf.

Your Agent will have the right to receive reasonable payment for services provided under this Durable Power of Attorney unless you provide otherwise in this Durable Power of Attorney. The powers you give your Agent will continue to exist for your entire lifetime, unless you state the Durable Power of Attorney will last for a shorter period of time or unless you otherwise terminate the Durable Power of Attorney. The powers you give your Agent in Durable Power of Attorney will continue to exist even if you can no longer make your own decisions respecting the management of your property. You can amend or change this Durable Power of Attorney only by executing a Durable Power of Attorney or by executing an amendment through the same formalities as an original. You have the right to revoke or terminate this Durable Power of Attorney at any time, so long as you are competent.

This Durable Power of Attorney must be dated and must be acknowledged before a notary public. You should read this Durable Power of Attorney carefully. When effective, this Durable Power of Attorney will give your Agent the right to deal with property that you now have or might acquire in the future. The Durable Power of Attorney is important to you. If you do not understand the Durable Power of Attorney, or any provision of it, then you should obtain the assistance of an attorney or other qualified person.

F4D4027 (200702042 07/07)

4    Trading Authorization

PAGE 3/5 * RCVD AT 3/12/2008 1:24:22 PM [Central Daylight Time] * SVR:IIS931IRFCOL1/4 * DNIS:3175 * CSID:4153962205 * DURATION (mm-ss):02-52





# Trading Authorization
### To Grant a Power of Attorney and Designate an Agent

## INSTRUCTIONS

Use this form to grant a power of attorney and designate an Agent ("Attorney-In-Fact") to act on your behalf in connection with your brokerage account ("Account") at Wells Fargo Investments, LLC ("WFI"). A separate Trading Authorization Form is required for each Account. This is an important legal document; please read it carefully. Before executing this Trading Authorization, you should know these important facts:

1. This document provides the person you designate as your Agent and Attorney-In-Fact with broad powers that may have legal and tax consequences.

2. You have the right to revoke or terminate this Trading Authorization at any time as long as you are competent. Any such revocation or termination shall be effective upon receipt of written notice by WFI.

3. The delegation of authority on trust accounts may be restricted by state law and/or WFI policy. Consult your own attorney for more information on your state's law and/or WFI for information on its policy.

4. A Full Trading Authorization is required to grant your Agent online access to your Account. A Limited Trading Authorization will grant your Agent with limited online access as specified below.

5. This Trading Authorization must be dated and must be acknowledged before a notary public.

6. If there is anything about this Trading Authorization you do not understand, you should consult your attorney.

7. This Trading Authorization supersedes and replaces any prior trading authorization that you may have executed with respect to your Account.

8. If your Account has check-writing privileges, you cannot grant an Agent a Limited Trading Authorization. A Full Trading Authorization must be selected below.

## 1. APPOINTMENT OF AGENT ONLY TO ACT IN ONE OF THE FOLLOWING CAPACITIES

NOTE: Client must initial only ONE box below. If neither or both boxes are initialed, the default is Limited Trading Authorization.

[INITIAL] **LIMITED TRADING AUTHORIZATION:**

■ The designated Agent and Attorney-In-Fact is hereby granted the authority to inquire in, trade, buy, sell (including short sales), exchange, convert, tender, or otherwise acquire or dispose of stocks, bonds, mutual funds, securities and other investments, on margin or otherwise, including the purchase and/or sale of option contracts, for and at the risk of Client, in the same manner and to the same extent as permitted to Client. Agent may open new option positions or close existing positions and exercise option contracts or sell option contracts as either a covered or uncovered writer (if available in account type). If Agent engages in either margin or option transactions, you, Client, recognize the inherent risks involved and are fully prepared to undertake such risks.

■ Agent may not change the Account mailing address or form of Account registration. The Limited Trading Authorization does not permit your Agent to withdraw, transfer, or disburse funds or assets from your Account. A Limited Trading Authorization will grant your Agent access to Account information by phone, online, in writing and/or, if selected, duplicate statements and/or confirms. Your Agent will be able to view all of the information that you are able to view online and will be able to perform online the same functions granted above.

X [INITIAL]  **FULL TRADING AUTHORIZATION:**

■ The designated Agent and Attorney-In-Fact is hereby granted the authority to inquire in, trade, buy, sell (including short sales), exchange, convert, tender, or otherwise acquire or dispose of stocks, bonds, mutual funds, securities and other investments, on margin or otherwise, including the purchase and/or sale of option contracts, for and at the risk of Client, in the same manner and to the same extent as permitted to Client (as applicable to account type) AND includes the authority to withdraw or transfer funds or assets regardless of the tax consequences of such a distribution. Agent may open new option positions or close existing positions and exercise option contracts or sell option contracts as either a covered or uncovered writer (if available in account type). If Agent engages in either margin or option transactions, you, Client, recognize the inherent risks involved and are fully prepared to undertake such risks.

FRD4027 (200703042 07/07)

MAR-12-2008 10:26 AM          4153962205          P. 3

**1. APPOINMENT OF AGENT ONLY TO ACT IN ONE OF THE FOLLOWING CAPACITIES** (continued)

- The Agent may initiate rollovers, Roth IRA conversions, IRA recharacterizations or other transfers between and among your accounts. A Full Trading Authorization does not give your Agent the power to establish an IRA or designate or change the beneficiary designation on any type of account.
- A Full Trading Authorization will grant your Agent access to Account information by phone, online, in writing and/or, if selected, duplicate statements and/or confirms. Your Agent will have full online access to your Account.

**2. DURABLE OR NON-DURABLE POWER OF ATTORNEY**

NOTE: Client must initial only ONE box below. If neither or both boxes are initialed, the default is Non-Durable Power of Attorney.

| INITIAL | **NON-DURABLE POWER OF ATTORNEY:** The Agent's trading authorization selected in Section 1 will expire upon receipt by WFI of written notice of the subsequent mental disability, incompetence, incapacity, or death of Client. |
|---|---|
| INITIAL | **DURABLE POWER OF ATTORNEY:** The Agent's trading authorization selected in Section 1 will NOT expire upon the subsequent mental disability, incompetence, or incapacity of the Client, but will expire upon receipt by WFI of written notice of the subsequent death of Client. |

**3. DUPLICATE STATEMENTS AND CONFIRMATIONS**

NOTE: Initial only if applicable.

| INITIAL | **DUPLICATE STATEMENTS AND/OR TRADE CONFIRMATIONS:** Client authorizes WFI to send duplicate account statements and/or trade confirmations as selected below to Agent at the address Agent has indicated in Section 6. |
|---|---|

☐ Account Statement only   ☐ Trade Confirmations only   ☐ Both Account Statements and Trade Confirmations

**4. CLIENT TERMS AND CONDITIONS**

I or, if this is a joint account, we (having signed below as "Client") hereby authorize the Agent named in Section 6 to be my Agent and Attorney-in-Fact, and in such capacity to perform any and all of the functions I have indicated under Section 1 including, without limitation, the authority in each case in my name or number on WFI's books, on my behalf and at my sole risk. If a Full Trading Authorization is chosen, this authorization extends to any changes in online functionality and Account access WFI may make in the future. This Trading Authorization applies to all securities and other property in the Account specified. I authorize WFI, and other persons to whom WFI has given instructions in order to implement the Agent's instructions, to follow and rely on Agent's instructions without obtaining my approval, countersignature, or co-signature.

I hereby ratify and confirm any and all transactions, trades, or dealings effected in and made by my Agent on my behalf for my Account whether before or after executing this Trading Authorization. I acknowledge and agree that I am solely responsible for investigating and selecting my Agent, that my Agent is not affiliated with, employed, or controlled by WFI or any of its affiliates, and that WFI is not responsible for and has no duty to review, monitor, or supervise my Agent's exercise of the powers granted in this Trading Authorization. I agree and, as applicable, on behalf of my or any joint owner's heirs, executors, administrators, successors, and current and future legal representatives, to indemnify and hold WFI and its affiliates harmless from any loss, damage, expense, or liability of any kind that WFI might sustain or that might be incurred by or imposed on WFI by reason of my appointment of my Agent or any of my Agent's acts or omissions in relation to the Account, and to pay promptly on demand any and all losses or debit balances due in my Account. My indemnification obligations under this Trading Authorization will survive the revocation or termination of this Trading Authorization.

I agree that the custodian of my IRA may rely upon this Trading Authorization without further inquiry or investigation and regardless of the date of such authorization.

FR04027 (200702042 07/07)

PAGE 5/5 * RCVD AT 3/12/2008 1:24:22 PM [Central Daylight Time] * SVR:IIS931R/FCOL/14 * DNIS:3175 * CSID:4153962205 * DURATION (mm-ss):02-52

**ACKNOWLEDGEMENT**

*Notwithstanding anything which can be interpreted to the contrary in this Trading Authorization, Wells Fargo Investments reserves the right to decline to honor Agent's instructions to transfer ownership of Client's assets for less than fair consideration.*

| CLIENT NAME (Please print) | SIGNATURE REQUIRED | DATE |
|---|---|---|
| Nathalie ALTHANi | *Nathani* | 03.10.08 |
| CLIENT NAME (If Joint Account) (Please print) | SIGNATURE REQUIRED | DATE |

NAME OF AGENT AND ATTORNEY-IN-FACT
H. M. ALLOUCH

| BRANCH OFFICE MANAGER NAME | BRANCH OFFICE SIGNATURE | DATE |
|---|---|---|
| DANIEL F. HILKEN | *Daniel Hilken* | 3-10-08 |

**5. NOTARIZATION**

State of CALIFORNIA , in the county of MARIN

Subscribed and sworn to (or affirmed) before me on this 10 day of MARCH , 2008
by NATHALIE ALTHANI , personally known to me or proved to me on the basis of satisfactory evidence to the person(s) who appeared before me.

| NOTARY PUBLIC | SEAL |
|---|---|
| | THUE THUESEN Commission # 1494224 Notary Public • California Marin County My Comm. Expires Jun 24, 2008 |
| MY COMMISSION EXPIRES | |
| June 24 '08 | |

**6. AGENT TERMS AND CONDITIONS**

By signing below, Agent agrees to be bound by the terms and conditions of this Trading Authorization and the terms and conditions of the Brokerage Account Agreement between Client and WFI, including but not limited to, the pre-dispute arbitration agreement contained in the Brokerage Account Agreement.

Agent agrees not to give or transmit any instruction concerning the Account that Agent knows or believes does not comply with the Trading Authorization or Agent's obligations, or if Agent knows or has reason to know that the Trading Authorization has been revoked, terminated, or suspended, in whole or in part, or is no longer valid for any reason. Agent agrees to indemnify and hold WFI and its affiliates harmless from any loss, damage, expense, or liability of any kind that Client might sustain or that might be incurred by or imposed on WFI by reason of Agent's breach of these terms and conditions or of the Brokerage Account Agreement, any act or omission in relation to the Account, or any dispute between Client and Agent. Agent's indemnification obligations hereunder will survive the revocation or termination of the Trading Authorization.

| AGENT'S NAME (Please print) | DATE OF BIRTH | SOCIAL SECURITY NUMBER |
|---|---|---|
| H. M. Allouch | 3-31-50 | 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 |
| AGENT'S CITIZENSHIP | GOV'T ISSUED PICTURE ID NUMBER | EXPIRATION DATE |
| ☑ U.S. ☐ Resident Alien (☐ Visa ☐ Green Card) ☐ Non-resident Alien | CDL | N0070047  3-31-1 |
| ID STATE/COUNTRY OF ISSUANCE | ISSUE DATE | HOME PHONE NUMBER | WORK PHONE NUMBER |
| CA/USA | 2-2-05 | 415-441-3348 | 415-441-0887 |
| AGENT'S LEGAL ADDRESS (No P.O. Boxes) | CITY | STATE | ZIP CODE |
| 1 Daniel Burnham ct | San Francisco | CA | 94109 |
| OCCUPATION | EMPLOYER | RELATIONSHIP TO CLIENT |
| Commerce | Self Employed | Friend |

LIST ALL PUBLICLY TRADED COMPANIES IN WHICH AGENT IS A DIRECTOR, CONTROL PERSON OR SHAREHOLDER OF 10% OR MORE OF THE OUTSTANDING SHARES.

IS AGENT EMPLOYED BY A BROKER-DEALER, THE NASD, NYSE OR A STOCK EXCHANGE?
(If yes, Broker-Dealer and NYSE employee please include a 407 Letter.)
☐ Yes   ☐ No

| AGENT'S SIGNATURE (Required) | DATE |
|---|---|
| *signature* | 3-10-08 |

FRM027 (200702042 07/07)

5   Trading Authorization



WELLS FARGO INVESTMENTS

# Brokerage Account Agreement

**Effective September 2007**

This agreement contains important terms and conditions governing Wells Fargo Investments accounts including all Brokerage Accounts, Margin and Option Accounts. Please read it carefully and keep it for future reference. If you have any questions regarding this document or your account, please call your financial consultant.

**Be sure to read and sign the last page of this booklet, which contains the disclosures, acknowledgements, and W-9 certification pursuant to your Wells Fargo Investments brokerage account. Simply complete the form, tear off and return to Wells Fargo Investments. You must return the form to Wells Fargo Investments to ensure your account will not be subject to backup withholding.**



To help the government fight the funding of terrorism and money-laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask for your driver license or other identifying documents.

©2007 Wells Fargo Investments, LLC.
BK04379 (200708117 08/07)

## I. BROKERAGE ACCOUNT TERMS AND CONDITIONS

My Brokerage Account at Wells Fargo Investments, LLC ("WFI") is governed by the Account Agreement which consists of these Brokerage Account Terms and Conditions including the Margin Terms and Conditions, the Client Acknowledgement/Agreement and the Disclosure Statement for Sweep Features that is in effect from time to time, and (if applicable), the Wells Fargo Online Access Agreement, the Option Agreement, and any other written agreements between me and Wells Fargo Investments pertaining to the Brokerage Account, all as amended from time to time. My Brokerage Account will not be opened until approved by Wells Fargo Investments.

As used in this Account Agreement, the words "I," "me," "my," "we," "us," "account holder," and "Client" means each person who has signed the Brokerage Account Agreement. "You," "your," "WFI" or "Wells Fargo Investments" means Wells Fargo Investments, LLC (member SIPC), a non-bank affiliate of Wells Fargo & Company, and its authorized agents. "Bank" means Wells Fargo Bank, N.A., an affiliate of WFI. "Brokerage Account" means one or more securities accounts opened in my/our name(s). "Business Day" means Monday through Friday, excluding U.S. stock exchange holidays. Although you may conduct business on bank holidays, bank holidays are not considered Business Days for purposes relating to the transfer of funds and check clearing.

If I am eligible and approved for margin privileges, I will also be sure to read carefully the *Margin Terms and Conditions* set forth below and the *Margin Risk Disclosure Statement.*

**1. Authority and Ownership; Account Information.** I am of legal age in the state in which I live and am authorized to enter into the Account Agreement. No additional authorizations from third parties are required for me to open the Brokerage Account and effect securities transactions therein. I will be the owner of all securities purchased, held or sold by me or will otherwise have the authority to purchase, hold or sell such securities. Except as I have indicated to you:

(i)  I am not an employee of or affiliated with any securities exchange or member firm of any exchange, the Financial Industry Regulatory Authority, Inc., or any securities firm, bank, trust company, or insurance company; and

(ii)  I am not a director, 10% beneficial shareholder, policy-making officer, or otherwise an "affiliate" (as defined in Rule 144 under the Securities Act of 1933) of a publicly-traded company.

The information I have provided is accurate and complete. I will promptly notify you in writing if such information becomes inaccurate for any reason.

**2. Account Type.** Wells Fargo Investments offers many different account types, including individual retirement accounts and other retirement accounts, custodial, estate, trust and partnership accounts. Account types may be subject to certain restrictions and eligibility requirements, and certain services are not available to all Clients and account types. I am responsible for selecting the account type that is appropriate for my needs and circumstances.

Unless I notify Wells Fargo Investments that I do not desire margin privileges, Wells Fargo Investments will, at its discretion (unless otherwise required by law), treat the signed Client Acknowledgement Agreement as a request to open a margin account. Wells Fargo Investments reserves the right to limit the number of cash and/or margin accounts I maintain (or have a beneficial interest in) at any one time. If I do not desire to use margin privileges, I understand that I can do so by not creating a debit in my account.

**3. Appointment of Wells Fargo Investments as Agent.** I appoint Wells Fargo Investments as my agent for the purpose of carrying out my instructions including instructions relating to the purchase and sale of securities, and I assume all investment risk with respect to such transactions. All transactions will be executed only on my order or the order of my authorized representative, except as otherwise provided herein. As my agent, you are authorized to establish relationships with clearing brokers and otherwise to appoint and use sub-agents. You and your sub-agents are authorized to, among other things, open or close brokerage accounts, establish a sweep bank deposit account, maintain customer records, hold securities in bearer, registered or book entry form, place and withdraw orders, and take such other steps as are reasonable in connection with your duties. Wells Fargo Investments may in its sole discretion and without prior notice to me refuse or restrict my orders. I understand that banks and other companies affiliated with Wells Fargo Investments may be investment advisors or lenders to issuers whose securities are brokered by Wells Fargo Investments.

I acknowledge that securities held in my Brokerage Account may carry with them valuable rights that expire unless some action is taken. I will be solely responsible for knowing the rights, terms, and deadlines for taking action with respect to securities in my Brokerage Account, and for taking action to realize the value of such securities. You will have no obligation to notify me of the nature of such rights or terms, or of impending deadlines or expiration or redemption dates affecting such securities.

**4. Not FDIC Insured.** I understand that securities and other assets held in my Brokerage Account are not deposit obligations, nor guaranteed by any bank affiliated with Wells Fargo Investments. Securities and other assets held in my Brokerage Account (except brokered certificates of deposit and the Wells Fargo Cash Sweep deposit account up to applicable limits or as otherwise disclosed) are not insured by the FDIC and are subject to investment risks, including possible loss of the principal amount invested. Assets held in my Brokerage Account will be protected against broker-dealer insolvency up to a value of $500,000 (limited to $100,000 for claims for cash) by the Securities Investor Protection Corporation ("SIPC"). Explanatory brochure available upon request or at www.SIPC.org or by calling SIPC at 202.371.8300.

Wells Fargo Cash Sweep deposit accounts are held at Wells Fargo Bank, N.A., in WFI's name for each client's benefit, and are FDIC-insured up to applicable limits. Please see the Disclosure Statement for Sweep Features for further information. I understand that it is my obligation to monitor the total amount of all direct or indirect deposits held by or for me with the Bank for purposes of determining the amounts eligible for coverage by FDIC insurance, including deposits in the Wells Fargo Cash Sweep deposit account.

The Wells Fargo Cash Sweep deposit account is not covered by SIPC, however, coverage in excess of any amount which may be recoverable under the FDIC provisions is provided by WFI's Lloyd's of London excess SIPC policy. Excess SIPC coverage is provided for my Brokerage Account by Lloyd's of London up to $149.5 million (which includes a $900,000 limit on claims for cash held including any funds in the Wells Fargo Cash Sweep deposit account). WFI's excess SIPC protection provided by Lloyd's of London contains an overall aggregate indemnity limit of $600 million. Neither coverage protects against investment losses in the Brokerage Account.

**5. Sweep Features and Alternatives for Cash Balances.** WFI offers several alternatives to earn income on uninvested available cash ("Cash Balances"). WFI's sweep features ("Sweep Features") include a sweep to an interest-bearing deposit account at the Bank ("Wells Fargo Cash Sweep"), or to a money market mutual fund ("Money Market Fund Sweep"). A "sweep" is the automatic transfer of Cash Balances to and from your Brokerage Account and Sweep Feature. The Sweep Features

**Investment and Insurance Products:**
▸ **Are NOT insured by the FDIC or any other federal government agency**
▸ **Are NOT obligations or deposits of or guaranteed by any Wells Fargo Bank or by any Bank affiliate**
▸ **Involve investment risk, including possible loss of principal**

Financial consultants are registered representatives of Wells Fargo Investments, LLC (member SIPC), a non-bank affiliate of Wells Fargo & Company. Private Client Services provides financial products and services through various banking and brokerage affiliates of Wells Fargo & Company, including Wells Fargo Investments, LLC.

1    WFI Brokerage Account Agreement                                    BK04379 (20070811 7 08/07)

shall be defined in the Disclosure Statement for Sweep Features, which you may change from time to time upon notice to me. I may obtain the current Disclosure Statement for Sweep Features by contacting my WFI investment professional or at www.wellsfargo.com/cashsweep.

I understand that my Brokerage Account will automatically default to the applicable Sweep Feature for my account type ("default Sweep Feature"), unless I select an available alternative.

I hereby authorize WFI to sweep available Cash Balances into the default Sweep Feature applicable to my Brokerage Account, unless I have selected an available alternative for which I qualify. Further, I understand and agree that if my Brokerage Account becomes ineligible for its existing Sweep Feature, that Sweep Feature may automatically and without notice be replaced with the applicable default Sweep Feature (the Wells Fargo Cash Sweep or Money Market Sweep) for my account type. In such situation, I authorize WFI to sell those securities I hold as a result of the Sweep Feature for which I am no longer eligible to participate. I understand that ineligibility may occur if:

(i)   my Household Balance (see the Disclosure Statement for Sweep Features for a definition of Household Balance) or Cash Balances fall below the required minimum;

(ii)  I become designated as a day-trader by WFI; or

(iii) if my Brokerage Account otherwise becomes ineligible.

I understand that after my Brokerage Account has been deemed ineligible for a particular Sweep Feature it will be changed to a default Sweep Feature. WFI will not change my Sweep Feature back to a former Sweep Feature for which my Brokerage Account is once more eligible, unless I affirmatively request a change.

You may, at your discretion, change or replace the available Sweep Features; including the default Sweep Feature for a particular account type. Except as provided below, you will give me advance notice of any such change in Sweep Features. I authorize you to withdraw cash or redeem money market mutual fund shares maintained in the prior Sweep Feature to invest or deposit the proceeds in the replacement Sweep Feature. In addition, I understand that different types of Sweep Features may be offered in connection with different types of accounts, services and products. If I decide to enroll in a new account, service or product with different Sweep Features, then I authorize you to withdraw cash or redeem money market mutual fund shares maintained in the prior Sweep Feature and to reinvest or deposit the proceeds in the new Sweep Feature without prior notice to me.

The Money Market Fund Sweep may, to the extent permitted by law, include money market mutual funds for which you and your affiliates receive transaction and other fees for providing services (such as investment advisory, administration, transfer agency, distribution and shareholder services) and these fees will vary depending on the money market mutual fund (or share class) used. There may be certain minimum requirements for initial and subsequent investments in the money market mutual funds. Investments in each money market fund are subject to restrictions, charges and expenses described in the applicable prospectus, which I will receive separately and agree to read carefully.

*Wells Fargo Funds Management, LLC, a wholly-owned subsidiary of Wells Fargo & Company, provides investment advisory and administrative services for the* Wells Fargo Advantage Funds.SM *Other affiliates of Wells Fargo & Company provide sub-advisory and other services for the Funds. The Funds are distributed by* Wells Fargo Funds Distributor, LLC, *(member FINRA/SIPC), an affiliate of Wells Fargo & Company.*

The price of money market mutual fund shares is the per share net asset value next determined after a purchase or redemption order is entered. While each money market mutual fund seeks to maintain a net asset value of $1.00, there is no guarantee that a fund will meet this objective. More complete information about each applicable money market mutual fund may be found in its prospectus. I will receive the appropriate prospectus at the time I open my Brokerage Account.

**6. Settlement and Free Credit Balances.** I agree that the Sweep Feature for my Brokerage Account will be used in connection with settlement of transactions in my Brokerage Account. Unless I select not to have a Sweep Feature and instead select free credit balance or link my Brokerage Account to a bank deposit account  to be used in connection with settle-

ment of transactions in my Brokerage Account (collectively the Sweep Features, free credit balance or a linked bank account are referred to herein as the "Settlement Choice"). You may, at your discretion, change or replace the available Settlement Choice. Except as provided elsewhere in this Agreement, you will give me advance notice of any such change in a Settlement Choice.

I will not purchase any security unless by settlement date there will be sufficient funds in my Settlement Choice or Brokerage Account to make the required cash payment, unless my Brokerage Account has been approved for margin privileges. I will make good delivery of properly endorsed securities sold. In order to satisfy my obligations to you, you may, at your discretion and without prior demand or notice to me, refuse to execute an order, or cancel, close, or liquidate at my risk any transaction, if settlement funds are not available or securities are not delivered. I will be responsible for all costs, commissions, and losses resulting from such actions including interest and costs of collection, which may include, without limit, reasonable attorney's fees. You may require an equity deposit or full payment before you accept an order.

I authorize and direct you to invest or deposit free credit balances, including dividends, interest or other cash received by you for my Brokerage Account in my Settlement Choice within a reasonable time after receipt. Proceeds from the sale of securities will be invested or  deposited in my Settlement Choice following settlement, provided that  the securities sold have been received in good deliverable form prior to the settlement date. Unless I instruct you otherwise, you are directed to hold non-cash proceeds in my Brokerage Account. Credit balances that are needed to settle a transaction or that are collateral for my obligations, such as a cash balance resulting from a short sale, will remain in the Brokerage Account and will not be deposited or invested in the Settlement Choice.

I further authorize and direct you to automatically withdraw cash, redeem money market mutual fund shares or sell securities maintained in my Settlement Choice or Brokerage Account when needed to settle a securities transaction or for any other purpose, such as to satisfy a debit balance, serve as collateral for a margin loan, short sale or option position or to satisfy any other obligation owed under the Brokerage Account Agreement or otherwise in connection with my Brokerage Account. If you fail to invest or deposit free credit balances according to this Agreement, your liability will be limited to the actual amount of the dividends or interest I would have earned had the free credit balances been invested or deposited in the appropriate Settlement Choice.

If you hold securities for my Brokerage Account in street name or bearer form bonds or preferred stock that are callable in part, I agree to participate in an impartial lottery allocation of the called securities, according to the rules of the applicable exchange.

**7. Payment of Indebtedness Upon Demand.** I shall at all times be liable for the payment promptly upon demand of any debit balance or other obligation owed under the Account Agreement or otherwise in connection with my Brokerage Account. I shall be liable for any deficiency remaining in my Brokerage Account in the event it is closed or assets in my Brokerage Account are liquidated by me or you. In order to satisfy any amount owed under the Account Agreement, I hereby irrevocably authorize and instruct you to liquidate any assets held in my Brokerage Account or in my Settlement Choice and to make transfers to the Brokerage Account from my Settlement Choice or from any other brokerage accounts with you.

**8. Security Interest.** As security for the repayment of my present or future indebtedness under the Account Agreement or otherwise, I grant to Wells Fargo Investments a first, perfected and prior lien and a continuing security interest and right of set-off with respect to, all securities and other property that are, now or in the future, held, carried, or maintained for any purpose in or through my Brokerage Account or Settlement Choice and any present or future accounts maintained by or through you or your affiliates; provided, however, that Wells Fargo Investments shall not have a lien, security interest or right of set-off with respect to, any securities or other property that is, now or in the future, held carried, or maintained for any purpose in or through any Brokerage Account that is pledged to Wells Fargo Bank as collateral for any indebtedness other than fees, expenses and charges applicable to such Brokerage Account. In enforcing your rights hereunder, you may, in your sole discretion and without regard to any tax or other consequences that I may face as a result of such actions, determine which securities are to be bought or

sold and the order in which they are to be sold and which contracts are to be closed. In the event of a breach or default by me under the Account Agreement, you will have the rights and remedies available to a secured creditor under all applicable laws in addition to the rights and remedies provided in the Account Agreement. I agree to indemnify and hold you and your affiliates harmless from and against any losses or expenses incurred in connection with enforcing your lien or any other remedies available to you, including reasonable costs of collection.

I further agree that if;

(i) I default on any of my obligations under the Account Agreement;

(ii) I become bankrupt, insolvent or subject to a similar condition or subject to any bankruptcy, reorganization, insolvency or other similar proceeding; or

(iii) you, at your discretion, deem it advisable for your protection, you may, at anytime and without prior notice to me;

   (a) cancel, terminate, accelerate, liquidate and/or close out any or all agreements or transactions between you and me or otherwise relating to the Brokerage Account and calculate damages in a manner you believe appropriate;

   (b) pledge, transfer or sell any assets in the Brokerage Account or any other account in which I have an interest (whether such account is held with you or your affiliates), either individually or jointly with others; or

   (c) take any other action as you, in your discretion, deem appropriate with respect to any of the foregoing and apply the proceeds to the discharge of the obligation.

In pursuing the remedies available to you, you may, without limiting your rights under this Section, set off amounts that I owe to you against any amounts that you owe to me and I will remain liable for any deficiency.

**9. Equity Order Routing and Payment for Order Flow; Mutual Fund Orders Cut-off Time.** Unless otherwise instructed, Wells Fargo Investments routes equity orders taking into consideration, among other factors, the quality and speed of execution, as well as the credits and cash payments receivable from any exchange, other broker dealers and other market centers. I also understand that whenever possible you will route orders to market centers displaying prices equal or superior to the nationally displayed best bid or best offer. I also understand that you will attempt to obtain the best execution regardless of any compensation you may receive. I understand that you may use the compensation received to help keep costs competitive and provide me with quality execution services. The nature and source of payments and/or credits received in connection with your specific transactions will be furnished to me upon written request.

**10. Limitation of Liability.** You will not be liable for loss or delay caused directly or indirectly by acts of war, terrorists attacks, strikes, natural disasters, government restrictions, exchange or market rulings, disruptions in orderly trading on any exchange or market caused by market volatility or trading volume, suspensions of trading, interruptions or delays affecting communications facilities or data processing services, or other conditions beyond your control.

**11. Confirmations and Statements.** Except as otherwise provided herein, confirmations of transactions and statements of my Brokerage Account shall be deemed correct and conclusive unless I notify you to the contrary in writing within the period specified on the confirmation or statement or, if not specified, within ten (10) days of receipt.

**12. Recording Conversations.** For our mutual protection, you may record any of my telephone conversations with you without further notice to me.

**13. Information Disclosure.** I have received a copy of the Wells Fargo Privacy Policy brochure which applies to personal information provided by any individual in connection with opening this Brokerage Account and describes Wells Fargo's general policies regarding the use and sharing of information. You may use and share information about me, and I may "opt out" of certain types of information sharing, in accordance with those policies. I/We authorize you to obtain consumer credit and other reports from any consumer reporting agency to obtain informa-

tion regarding opening my/our account or for any other purpose for so long as my/our account is open or any amount is owed to you. Even if I opt out of information sharing with third parties for marketing purposes as described in the Privacy Policy brochure, unless I separately object in writing, you may release my name, address and security positions to the companies that issued such securities if requested by those companies.

**14. Restricted Securities.** I will notify you of the status of any securities in my Brokerage Account that are;

(i) "restricted securities" or securities of an issuer of which I am an "affiliate" (as those terms are defined in Rule 144 under the Securities Act of 1933; or

(ii) securities that I am selling in reliance on Rule 145(d) under such Act. I will promptly furnish whatever information and documents (including counsel opinions, if requested) that you need to comply with your regulatory duties in connection with transactions involving such securities. I agree not to tender any such securities as collateral for an obligation I owe you, unless I first obtain your written consent.

**15. Pre-Dispute Arbitration Agreement.**

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE. BY SIGNING AN ARBITRATION AGREEMENT THE PARTIES AGREE AS FOLLOWS:

- ALL PARTIES TO THIS AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.

- ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.

- THE ABILITY OF THE PARTIES TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.

- THE ARBITRATORS DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD.

- THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

- THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION. IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.

- THE RULES OF THE ARBITRATION FORUM IN WHICH THE CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.

NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL;

(i) THE CLASS CERTIFICATION IS DENIED; OR

(ii) THE CLASS IS DECERTIFIED; OR

(iii) THE CLIENT IS EXCLUDED FROM THE CLASS BY THE COURT.

SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

I AGREE THAT ALL CLAIMS, CONTROVERSIES AND OTHER DISPUTES BETWEEN ME AND WELLS FARGO INVESTMENTS AND ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, OR

AGENTS ARISING OUT OF OR RELATING TO THE BROKERAGE ACCOUNT OR ANY ORDERS OR TRANSACTIONS THEREIN OR THE CONTINUATION, PERFORMANCE OR BREACH OF THE BROKERAGE ACCOUNT AGREEMENT OR ANY OTHER AGREEMENT BETWEEN YOU AND ME, WHETHER ENTERED INTO BEFORE, ON, OR AFTER THE DATE THIS ACCOUNT IS OPENED, SHALL BE DETERMINED BY ARBITRATION CONDUCTED BY, AND SUBJECT TO THE ARBITRATION RULES THEN IN EFFECT OF THE FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC. THIS AGREEMENT TO ARBITRATE SHALL BE SPECIFICALLY ENFORCEABLE UNDER PREVAILING LAW AND PROCEDURES. THE AWARD RENDERED BY THE ARBITRATORS SHALL BE FINAL, AND JUDGMENT MAY BE ENTERED UPON IT IN ANY COURT HAVING JURISDICTION OVER THE PARTIES. COUNSEL CAN ADVISE ME ON HOW THIS PROVISION MAY AFFECT ME.

**16. Fees and Charges.** I agree to pay the applicable brokerage commissions for my account. I further agree to pay the fees and charges for my transactions as specified in the Service Schedule, as such schedule may be amended from time to time. Wells Fargo Investments may amend the Service Schedule at any time without notification to me. I understand and agree that I may be charged an account maintenance fee (as defined in the Service Schedule) if no trading occurs during any calendar year. I agree that you may debit my Brokerage Account for any commissions, fees or charges which I incur, or any reasonable out-of-pocket expenses you may incur on my behalf. I agree to pay or reimburse you for all applicable state and local excise taxes.

**17. Joint Accounts.** If the Brokerage Account is maintained in the name of two or more persons, each account holder agrees to be jointly and severally liable for obligations under the Account Agreement. Each account holder will have authority, acting individually and without notice to any other account holder, to give instructions, buy, sell, and otherwise deal in securities and other property, and to generally deal with WFI with regard to the Brokerage Account as fully and completely as if each account holder alone were interested in the Brokerage Account. WFI is authorized to follow the instructions of any account holder and to deliver funds, securities, or other assets held in the Brokerage Account to any account holder or in accordance with any account holder's instructions. Unless we have stated otherwise, we intend to hold assets in the Brokerage Account as joint tenants with rights of survivorship. WFI is not responsible for determining the purpose or propriety of an instruction you receive from any account holder or for the disposition of payments or deliveries among joint account holders. Any notice you send to one account holder will be deemed to be notice to all account holders. The authority granted in this section will remain in force until you receive written notice of its revocation. Wells Fargo Investments, in its sole discretion and for its sole protection, may terminate the Brokerage Account upon receipt of such notice and may require the written consent of all account holders prior to acting upon the instructions of any account holder.

Laws governing joint ownership of property vary from state to state. I understand that I am responsible for verifying that the joint registration I select is valid in my state. Generally, however, for joint tenants with rights of survivorship, in the event of the death of either tenant, the entire interest in the joint account shall be vested in the surviving joint tenant(s) on the same terms and conditions. For tenants in common, the interest in each tenancy shall be equal unless specified and in the event of death of either tenant the interest in their share of the tenancy shall vest in the decedent's legal representative. State laws regulating community property vary. I understand that I should consult my personal legal advisor regarding laws of my state of residence.

**18. Dividend Reinvestment Program.** If I have elected to use the Dividend Reinvestment Program ("Program"), WFI will automatically reinvest any dividends and capital gains distributions ("Qualified Monies") in additional shares of the same securities I have designated for the Program. This Program is available for most listed New York Stock Exchange, American Stock Exchange and NASDAQ common stocks, and certain preferred stocks, held in my Brokerage Account in nominee name ("Approved Securities"). Some securities may be specifically ineligible, such as foreign issued common stocks, even though they may fall into one of the eligible categories. WFI will reinvest all Qualified

Monies into whole and fractional shares rounded to three decimal places. I understand that fractional shares will be held in a Fractional Share Account and that I may not vote such shares. I understand that dividend reinvestment does not assure profits in my investments and will not protect against any losses in declining markets.

I may reinvest Qualified Monies in all or some of the Approved Securities in my Brokerage Account. If I have elected to reinvest ALL future Qualified Monies, this Program will also apply to approved future holdings as well as current holdings. If I have elected instead to reinvest Qualified Monies in only certain selected Approved Securities in my Brokerage Account, I will advise you whether or not to reinvest each time I buy a new Approved Security or deposit one into my Brokerage Account. If, at the time of purchase or deposit of a new Approved Security into my Brokerage Account, there is no indication that I wish to participate in the Program for that Approved Security, I understand that I will receive Qualified Monies in cash, rather than reinvested shares.

On the day Qualified Monies are credited to my Brokerage Account, you will reinvest those funds at the current market price on the morning of payable date for each designated Approved Security. Written confirmation of these transactions will not be provided. All Dividend Reinvestment activity will be detailed on my regular Brokerage Account statement, including purchase price and the number of shares purchased (including fractional shares).

If I sell the entire position of one of my Approved Securities before Qualified Monies to which I am entitled are credited, WFI will not reinvest those Qualified Monies in that security. When I sell my entire position in any Approved Security, any fractional shares will be sold automatically. If my position is sold in multiple executions on the same day, the fractions will be sold at my first execution price. My trade confirmation will reflect whole shares sold through the appropriate exchange or market. My fractional shares will appear on the same confirmation as being sold through the Fractional Share Account.

WFI reserves the right to suspend or delete an otherwise Approved Security from Qualified Monies reinvestment at any time, without notice, in response to overall market conditions, trading halts, exchange closing, late openings or any other unusual events. WFI will not allow market purchase or sale of fractional shares, except in the case of a sale of the entire position of an Approved Security in which I hold fractional shares. Should my position decrease to less than one share, any fractional shares will be sold at your discretion. WFI reserves the right to set minimum amounts eligible for reinvestment. Reinvestment must be based on the total share position held in an Approved Security.

I will contact you if I wish to terminate or make any changes to my Dividend Reinvestment Program instructions at least 5 business days before the payment date of any Qualified Monies. Written confirmation of changes will not be issued; however, each business day, you will be able to tell me about the current status of any reinvestment transactions. Reinvestment will be determined based on my reinvestment election one business day before Qualified Monies are credited to my Brokerage Account.

WFI reserves the right to modify the terms of the Dividend Reinvestment Program, or discontinue or suspend the Program (in whole or in part), at any time, without notice.

**19. Mutual Fund Automatic Investment or Withdrawal Plans.** If I instruct you, orally or in writing, to establish an automatic investment or withdrawal plan for me in a mutual fund, I authorize you to purchase or redeem shares in the mutual fund in the amount and at the time period that I instruct you to by initiating fixed debits or credits periodically to my Settlement Choice. I understand that in order to establish an automatic investment or withdrawal plan that is linked to a bank account, I must first set up a link to that bank account. Such bank links are governed by applicable Automated Clearing House rules. I also authorize you to honor all debit entries initiated by me or on my behalf from time to time through my Settlement Choice. All such debits are subject to sufficient collected funds in my designated account to pay the debit when presented. I agree that your treatment of each entry and your right to accept an item shall be the same as if each were signed personally by me.

I acknowledge that I will carefully read the prospectus for the fund that I select prior to establishing such a plan. I understand and agree that you will not provide me written confirmation of such automatic investment

or withdrawal transactions and that the activity will, instead, appear on my monthly or quarterly statement, as applicable to the investment plan frequency that I choose.

If there is insufficient cash from my Settlement Choice to purchase shares for an automatic investment plan, I understand that the automatic investment scheduled for that period may not take place. I understand and acknowledge that any change in ownership or cancellation of my Brokerage Account, or any transaction returned for any reason, including but not limited to insufficient funds in my Settlement Choice, may result in the cancellation of my automatic investment or withdrawal plan without prior notice to me. I understand and acknowledge that you reserve the right to modify or terminate my automatic investment or withdrawal plan at any time and for any reason upon notification to me at my Brokerage Account address of record.

I understand and acknowledge that, in order to terminate my automatic investment or withdrawal plan, I must make a request in writing of my intention to you. I further agree that my automatic investment or withdrawal plan is to remain in effect until three business days after you have received my notification to cancel the plan. I will remain liable for all items that have not been settled at the time of termination of any plan.

I agree that you will not be liable for any loss incurred by me in connection with transfers from or to my Settlement Choice unless you are grossly negligent in fulfilling your responsibilities in regards to my automatic investment or withdrawal plan. In no event will you be liable for consequential, special or indirect damages or loss. You will undertake to make transfers as instructed by me in order to effect my automatic investment or withdrawal plan, but you will not be responsible for damages of any nature resulting from delays, failures, omissions, or errors relating to such transfers. You may, at your discretion, require periodic oral or written reaffirmation of my instructions regarding transfers and you may terminate this service at any time. I will indemnify you and your officers, employees, agents, successors, and assigns against any and all claims or liabilities by virtue of your acting on my automatic investments or withdrawal instructions. This indemnity is unlimited and shall be binding upon my heirs, successors, and assigns. You shall have no liability for costs or damages resulting from inaccuracy of information which I provide to you, or from my failure to update any information which I provide to you.

## 20. Electronic Funds Transfers; General Terms. I may instruct Wells Fargo
Investments to initiate electronic funds transfers ("EFTs") between my Brokerage Account and an account at a bank or other financial institution. I may authorize transfers to occur on a regular, recurring schedule, upon my request without regard to any schedule, or both.

I hereby authorize you and your processing bank to initiate transfers of money, according to my instructions, between the bank or other financial institution account(s) which I designate ("Bank Account") and my Brokerage Account. I understand that such account(s) must be maintained at a domestic financial institution capable of processing Automated Clearing House ("ACH") transactions. You will debit or credit my Brokerage Account for these EFTs in accordance with the terms of the EFT and this Account Agreement. My payment instruction shall be subject to the rules of the National Automated Clearing House Association, and I agree to be bound by such rules, as amended from time to time.

I agree to comply with any security procedure established by you from time to time to verify the authenticity of my payment instructions. I acknowledge and agree that this security procedure is not to detect an error in my payment instruction. You may reject any payment instruction if I do not adhere to any security procedure established by you. I am responsible for the confidentiality of any such security procedure and any passwords, codes, security devices and related instructions provided by you to me in connection with the security procedure.

If for any reason funds are added to or deducted from my Brokerage Account or my Bank Account in error, I authorize you, your processing bank and my Bank to make any debits or credits to my Brokerage Account or my Bank Account to correct the error. This authority shall remain in full force and effect until you have received written notification from me of its termination, in such time and in such manner as to afford you, your processing bank and my Bank a reasonable opportunity to act on such notification. You shall have no liability for costs or damages

resulting from inaccurate information (or from my failure to update any information), which I have provided to you.

EFTs normally will be processed on all days that are Business Days. EFTs requested after 2:30 p.m. Central time on any Business Day, or requested for a day other than a Business Day, generally will be processed on the next Business Day. I understand that if the EFT is dependent on the processing of a money market mutual fund transaction, my EFT may be processed on the next Business Day.

Funds sent from my Brokerage Account to my Bank Account will be debited from my Brokerage Account on the date the EFT is processed by you ("Transfer Date"), and generally will be available in my Bank Account on the next Business Day. EFTs to a Wells Fargo Bank account will be posted to the Bank Account on the Transfer Date. I understand, however, that the posting and funds availability policies of other financial institutions may vary and that you cannot guarantee the time period in which funds transferred from my Brokerage Account will be credited to an account at another financial institution. Funds sent from my Bank Account to my Brokerage Account will be posted to my Brokerage Account on the Transfer Date. For transfers of funds into my Brokerage Account, you will assign a three Business Day hold time that must pass before funds are available for withdrawal. However, funds are available on the Transfer Date for investment in securities or to reduce any debit balance in my Brokerage Account.

You will notify me as soon as possible, by telephone or in writing, if an EFT cannot be processed by you or has been rejected by my Bank. You reserve the right to refuse to honor my request for an EFT for any reason. Any change in ownership of my Brokerage Account, the cancellation of my Brokerage Account, or a transaction returned because my Bank has closed or frozen my Bank Account may result in the cancellation of my EFT privileges, including the cancellation of any recurring transfer instruction you may have on record for my Brokerage Account or one-time transfers already requested, but not yet processed. If my EFT privileges are canceled for any reason, I will remain liable for any outstanding transfers, whether arising before or after such cancellation.

## 21. EFT Transactions Initiated by Third Parties. I also may arrange for third parties to initiate electronic transactions that result in one-time or periodically recurring credits or debits to my Brokerage Account by contacting the third parties and following the procedures provided by such third parties. For example, I may arrange for the direct deposit of my salary, Social Security, pension or other recurring payments into my Brokerage Account. These third party arrangements will be described in agreements between me and the third party. I understand that you are not responsible for any action or failure to act by such third party. I acknowledge and agree that if I permit another party to credit or debit my Brokerage Account, I am responsible for any transactions made and charges incurred by such third party, even if such third party exceeds my authorization.

## 22. Stop Payment On EFT Transactions. If I have authorized you in advance to initiate recurring transfer debits to my Brokerage Account, I can stop any of these payments by calling or writing my financial consultant, at the address or telephone number provided on my Brokerage Account statement, in time for you to receive my request three Business Days or more before the payment is scheduled to be made. I am responsible for notifying the person or entity to whom these recurring transfers are directed that I have revoked my previous authorization for such recurring transfer debits to my Brokerage Account. If I contact you by telephone, you may require me to submit my request in writing and deliver it to you within 14 calendar days after my call. You will charge me a fee for each stop-payment order I give as specified in the Service Schedule applicable to my Brokerage Account. If these recurring transfer payments vary in amount, the person or organization that I am going to pay is required to tell me, 10 calendar days before each payment, when it will be made and how much it will be. If I order you to stop one of these payments three Business Days or more before the transfer is scheduled, and you do not do so, you will be liable for my losses or damages, subject to this Agreement.

## 23. Your Liability for EFTs. If you do not complete an EFT to or from my Brokerage Account on time or in the correct amount according to your agreement with me, you will be liable for my actual losses or damages. However, you will not be liable if;

BK04379 (200708117 08/07)

(i) through no fault of your own, I do not have enough money in my Brokerage Account to make the transfer;

(ii) funds in my Brokerage Account are subject to legal process or other encumbrance restricting transfer; or

(iii) circumstances beyond your control, including but not limited to fire, flood, earthquake, strike, or other emergency situation, prevent the transfer, despite reasonable precautions that you have taken.

I understand that there may be additional exceptions stated in other agreements you have with me.

**24. Unauthorized EFT Transactions.** If I suspect that an unauthorized person is initiating EFTs to or from my Brokerage Account, I will notify you as soon as possible by calling or writing my financial consultant at the address or telephone number provided on my Brokerage Account statement.

I understand that I have no liability for unauthorized EFTs if I notify you of the unauthorized transaction within 60 calendar days of when the first statement showing the unauthorized transaction was mailed to me. If a good reason (such as a long trip or a hospital stay) kept me from telling you of the unauthorized transaction, you will extend the time period to a reasonable period.

If I do not notify you within 60 calendar days of when the first statement showing the unauthorized transaction was mailed to me, I must satisfy the following conditions to have no liability:

(i) I must have reported to you the loss or theft of any passwords, codes or security devices assigned to me within 48 hours of discovery of the loss or theft.

(ii) I must have promptly reviewed any periodic statement that is provided to me. If I discover on my periodic statement any unauthorized use of any passwords, codes or security devices assigned to me, I must have reported the unauthorized transaction to you within 48 hours of the discovery.

(iii) I must have exercised reasonable care in safeguarding from loss or theft any passwords, codes or security devices assigned to me.

(iv) I must not have reported two or more incidents of unauthorized use to you within the 12-month period immediately preceding my claim.

(v) My Account must be in good standing. "Good standing" means that;

   (a) my Brokerage Account has been opened for more than 12 months;

   (b) there was a positive balance at the time of my claim; and

   (c) I have a satisfactory history of handling any overdrafts or returned, deposited items.

(vi) I may also be required to provide additional documentation in support of my claim, including an affidavit of unauthorized use and a police report.

If I do not notify you within 60 calendar days of when the first statement showing the unauthorized transaction was mailed to me, I will have the burden of proving that the transaction was not authorized.

If I do not satisfy the aforementioned conditions, I may not get back any money I lost after the expiration of said 60 calendar days, if you can prove that you could have stopped someone from taking the money if I had otherwise complied with the conditions set forth in this section.

**25. In Case of Errors or Questions About EFTs.** If I believe there is an error involving an EFT to or from my Brokerage Account as reflected on my statement, or any receipt or notice provided to me, I must call or write my financial consultant at the address or telephone number provided on my Brokerage Account statement. You must hear from me no later than 60 calendar days after you sent the first statement on which the problem or error appeared. I must provide to you;

(i) my name and Brokerage Account number;

(ii) a description of the error or the transfer I am unsure about, and explain as clearly as I can why I believe it is an error or why I need more information; and

(iii) the dollar amount of the suspected error.

If I tell you orally, you may require that I send you my complaint or question in writing within 10 Business Days. You will determine whether an error occurred within 10 Business Days (20 Business Days if the alleged error involves an EFT to or from a Brokerage Account within 30 calendar days after the first deposit to the Brokerage Account) after you hear from me and will correct any error promptly. If you need more time, however, you may take up to 45 calendar days (90 calendar days for foreign transactions or if the transaction occurred within 30 calendar days of the first deposit to the Brokerage Account) to investigate my complaint or question. If you decide to do this, you will credit my Brokerage Account within 10 Business Days for the amount I think is in error, so that I will have the use of the money during the time it takes you to complete your investigation. If you ask me to put my complaint or question in writing and you do not receive it within 10 Business Days, you may decide not to credit my Brokerage Account or may debit my Brokerage Account for any or all of the credit you previously provided to me. You will tell me the results within three Business Days after completing your investigation. If you decide that there was no error, you will send me a written explanation and will debit my Brokerage Account for any provisional credit previously provided in connection with the error allegation. I may ask for copies of the documents that you used in your investigation.

**26. Market Quotes.** I understand that Wells Fargo Investments will make every reasonable effort to have accurate real time market quotes and information available during market hours. However, I understand that Wells Fargo Investments cannot and does not guarantee the accuracy or availability of such market quotes and information. Accordingly, I agree that your sole liability for customer claims arising out of the interruption in, accuracy of or delay in receiving market quotes and information shall be to use your best efforts to resume the quote service as promptly as reasonable practicable.

**27. Online Services.** I agree to use the Wells Fargo Investments internet and Automated telephone services (collectively, the "Service") and any additional services offered through the Service in the future, in accordance with the provisions detailed in this section. I shall be the only authorized user of the Service under this Agreement. I shall be responsible for the confidentiality and use of my Brokerage Account and Personal Identification Number ("PIN").

I understand that I shall be solely responsible for all orders entered through the Service using my Brokerage Account number and PIN. I further understand and agree that, as a condition of the "Service" to place orders and send/receive information, I shall immediately notify Wells Fargo Investments if;

(i) an order has been placed through the Service and I have not received an order number,

(ii) an order has been placed through the Service and I have not received an accurate acknowledgement (whether through hard copy, electronic or verbal means) of the order of its execution;

(iii) I have received acknowledgement (whether through hard copy, electronic or verbal means) of the existence of or an execution for an order which I did not place, or any similar conflict or;

(iv) I became aware of any unauthorized use of my Brokerage Account number or PIN.

I understand and agree that you may, in your sole discretion, place trading restrictions on my Brokerage Account and that you reserve the right, in your sole discretion, to review and reject, cancel or modify any order that I place through the Service for any reason and without prior notice to me, including orders for which I have received an order number. I understand that any order I place may be deemed, in your sole discretion, to be disruptive to the securities markets, unacceptable in size, type or credit risk, or exceed your authorized limits.

Further, I acknowledge that market orders cannot always be cancelled because they are subject to immediate execution, and my order may be executed before a request for cancellation is received by you from me.

I agree that Wells Fargo Investments and its affiliates will not be liable for any consequential, incidental, special, or indirect damage (including lost profits, trading losses and damages) that result from inconvenience, delay

BK04379 (20070817 08/07)

or loss of use of the Service. I agree that you reserve the right to suspend or terminate my access to any Service for any reason and without prior notice to me.

I further agree that Wells Fargo Investments and its affiliates will not be liable for any losses resulting from a cause over which Wells Fargo Investments or its affiliates does not have direct control, including but not limited to the failure of electronic or mechanical equipment or communication lines, telephone or to other interconnect problems (such as not being able to connect to my ISP), unauthorized access, theft, operator error, acts of God, strikes or other labor problems. I agree that should I experience any problems in reaching Wells Fargo Investments through any particular method, I will attempt to use alternate methods to communicate with you.

**28. Third Party Information.** By accessing third party Web sites and the information through links provided through the Service, I acknowledge and agree that;

(i) the material available on these sites has been produced by independent providers that are not affiliated with Wells Fargo Investments; and

(ii) any opinions or recommendations expressed are solely those of the independent providers and are not the opinions or recommendations of Wells Fargo Investments.

Information obtained by the independent providers (the "Information") is believed to be reliable. However, Wells Fargo Investments does not guarantee the timeliness, sequence, accuracy, adequacy, or completeness of such Information. WELLS FARGO INVESTMENTS GIVES NO EXPRESS OR IMPLIED WARRANTIES (INCLUDING BUT NOT LIMITED TO WARRANTIES OR MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE) WITH RESPECT TO THIS INFORMATION. Neither Wells Fargo Investments nor any independent provider/transmitter of Information shall be liable in any way, and I agree to indemnify and hold harmless Wells Fargo Investments and the independent providers/transmitters for;

(i) any inaccuracy, error, or delay in, or omission of, any Information or the transmission or delivery of Information;

(ii) any loss or damage arising from or occasioned by;

(a) any such inaccuracy, error, delay, or omission;

(b) non-performance;

(c) interruption of Information due either to any negligent act or omission by Wells Fargo Investments or providers/transmitters of Information or to any act of God or any other cause beyond the reasonable control of Wells Fargo Investments or the Information providers/transmitters.

**29. Research.** Wells Fargo Investments may make available information about securities and investment strategies, including research reports, market commentaries and other information ("Research Reports") prepared or published by Wells Fargo Investments or its affiliates, as well as materials prepared by third parties. By accessing the Research Reports and information, I acknowledge and agree that these materials are not personalized or in any way tailored to reflect my personal financial circumstances or investment objectives, and the securities and other investment strategies discussed may not be suitable for me. The Research Reports and information do not take into account the particular investment objectives, financial situation or needs of individual clients. I understand that the Research Reports are provided for my private information, and you are not soliciting any action based on them. I acknowledge and agree that I will not view the fact that you are making the Research Reports available as a recommendation to me of any particular security or investment strategy. Under no circumstances should any information contained in the Research Reports be construed as an offer to sell or the solicitation of an offer to purchase any security. The Research Reports have been prepared as of the date indicated and should only be considered current as of the initial publication date and may become unreliable for various reasons including, but not limited to, changes in market or economic conditions.

THE RESEARCH REPORTS ARE OBTAINED FROM SOURCES DEEMED TO BE RELIABLE, HOWEVER, WELLS FARGO INVESTMENTS AND ITS AFFILIATES DO NOT GUARANTEE THE ACCURACY, COMPLETENESS OR THE CORRECT SEQUENCING

OF THE RESEARCH REPORTS AND EXPRESSLY DISCLAIM ALL WARRANTIES, EXPRESS AND IMPLIED, WITH REGARD TO THE RESULTS TO BE OBTAINED FROM THEIR USE, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY IMPLIED WARRANTIES ARISING FROM A COURSE OF PERFORMANCE, A COURSE OF DEALING, OR TRADE USAGE. Wells Fargo Investments and its affiliates shall not be obligated to update information or opinions regarding any company or security. The Research Reports are not intended to provide tax, legal or investment advice. Wells Fargo Investments and its affiliates shall not be liable for any consequential, incidental, special, or indirect damage (including, but not limited to, lost profits, trading losses and damages) that may result from use of the Research Reports or for omissions or inaccuracies of the information contained therein. I understand that I am strictly prohibited from reproducing, redistributing or retransmitting any information contained in the Research Reports. I will not contact any analyst who authors or is named on any Research Report or any representative of any third party provider.

**30. Amendments and Waiver.** You may amend the Account Agreement at any time and in any respect, effective upon written notice to me. No party will be deemed to have waived rights under the Account Agreement except through a writing signed by the party waiving the rights. A waiver will apply only to the particular circumstance giving rise to the waiver and will not be considered a continuing waiver in other similar circumstances, unless the intention to grant a continuing waiver is expressed in writing.

**31. Termination.** You may terminate any or all services hereunder at any time, effective upon written notice to me. I may close my Brokerage Account at any time by giving written notice to you. When my Brokerage Account is closed and after I have satisfied all of my obligations to you, you will return to me or deliver according to my instructions any assets remaining in my Brokerage Account and will no longer accept my further orders for transactions. Closing my Brokerage Account or terminating services under this Brokerage Account will not affect any rights and obligations incurred prior to such closure or termination.

**32. Notice of Changed Name, Address, Settlement Choice, Employment.** I agree to notify you promptly in writing of any change in my name, address, employment or designation of Settlement Choice.

**33. Governing Law.** The Account Agreement shall be governed by the laws of the State of California, as applied to contracts entered into and performed completely within California.

**34. Assignment.** You may assign your rights and obligations under the Account Agreement to any subsidiary, affiliate, or successor by merger or consolidation without notice to me, or to any other entity upon thirty days written notice to me. The Account Agreement shall be binding on and benefit me and your heirs, executors, administrators, successors, and assigns.

**35. Severability.** If any provision of the Account Agreement is determined to be invalid, illegal or unenforceable under any law or regulation, it shall not affect the validity of the remaining provisions of the Account Agreement, which shall remain in full force and effect.

**36. Entire Agreement.** The Account Agreement, as amended from time to time, is the complete statement of the agreement between you and me with respect to the subject matter hereof, and supersedes all prior or contemporaneous agreements.

## II. MARGIN TERMS AND CONDITIONS

**1. Margin Privileges.** Margin trading is not for everyone. Margin clients should be certain they understand the operation of a margin account under various market conditions and should examine their investment objectives, financial resources and risk tolerance to determine whether margin trading is appropriate. Margin privileges involve the extension of credit by Wells Fargo Investments to me, secured by the collateral in my Brokerage Account or Sweep Feature or Alternative. The amount borrowed will appear as a debit balance on which I will be charged interest at varying rates as described in Section II, number 6. I understand that increased leverage which margin provides may heighten both risks and rewards. By entering into this Agreement, I acknowledge receipt of the *Margin Risk Disclosure Statement* which contains more information about the risks associated with margin trading. I understand that

Wells Fargo Investments reserves the right to not extend margin privileges, even if margin privileges have previously been extended to me, for any reason without prior notice to me.

**2. Pledge of Securities.** Wells Fargo Investments may borrow money to lend to margin clients, including me, and may pledge clients' securities and other assets as collateral for such loans. I give WFI permission, without notice to me, to pledge and hypothecate my securities and other property, separately or together with assets of other margin clients, as collateral for any outstanding loans I may have from you at that time.

In return for the extension or maintenance of credit by WFI in connection with my Brokerage Account, I acknowledge that the securities in my Brokerage Account, together with all attendant rights of ownership, may be lent to you or lent out to others. In connection with such loans, and in connection with securities loans made to me to facilitate short sales, WFI is authorized to receive and retain certain benefits (including interest on my collateral posted for such loans), to which I will not be entitled. In certain circumstances, such loans may limit, in whole or in part, my ability to exercise voting rights of the securities lent. I also acknowledge, in connection with such loans, that I may receive substitute payment or payment in lieu of a dividend, instead of a qualifying dividend, and may, therefore, be subject to a higher tax rate on this payment. I understand that this payment would be reported to me on an IRS Form 1099-MISC, instead of an IRS Form-DIV.

**3. Adequate Margins & Repayment.** In the interest of maintaining a sound financial condition, a securities broker-dealer must be able to act appropriately and promptly with respect to each extension of credit it has made. Economic and market conditions change, often rapidly, and the values of individual securities can be volatile. In light of such conditions, WFI retains absolute discretion in determining when additional collateral will be required from me.

I agree at all times to maintain such margins for my Brokerage Account as required by law or custom, or as WFI may deem necessary or advisable. I also promise to discharge my obligations to WFI upon demand; this obligation survives termination of my Brokerage Account. Any oral agreement to the contrary will be unenforceable. No Wells Fargo Investments financial consultant, branch office manager or branch employee has any authority to waive or modify margin calls or postpone sell-outs or buy-ins.

**4. Liquidations & Covering Positions.** If for any reason, in your sole discretion, you deem it necessary or advisable, I authorize you;

(i)  to require additional collateral or equity from me;

(ii)  to sell or transfer any or all of my securities and other property, from any of my accounts;

(iii)  to buy in (or "cover") any securities and other property of which my accounts may be short; and

(iv)  to cancel any outstanding orders or close out any commitments made on my behalf.

Circumstances prompting WFI to take such action could include, but are not limited to;

(i)  extreme market volatility or trading volume;

(ii)  my failure to promptly supply additional collateral upon request;

(iii)  filing of an attachment, levy or petition of bankruptcy against me, my accounts or assets in my accounts; or

(iv)  my incapacity or death.

Notwithstanding WFI's general policy of giving notice of a margin deficiency, and despite any specific incidents or prior course of conduct between us, I understand WFI may and I authorize WFI to liquidate securities and other property to satisfy margin maintenance requirements, without notice to me and without any prior request for additional margin from me.

You may perform such sales or transactions according to your judgment and discretion—with or without prior notice or advertisement—on the exchange or other market where such business is usually transacted; or at public auction or private sale (including transactions with you for your own account); and I waive any right of redeeming the proceeds of such transactions without your consent.

**5. Short Account—Marking to Market.** Short securities will be "marked to the market" periodically. If a security which I sold short (or "short against the box") appreciates in market value over the selling price, my margin account will be debited, and if the security depreciates in value my margin account will receive a credit.

**6. Rate of Interest Charged; Credit Terms.** Securities and Exchange Commission Rule 10b-16 requires a broker who extends credit to a client, in connection with a securities transaction or otherwise, to furnish specified information detailing the terms and conditions under which interest will be charged.

I agree to be charged interest on any credit extended to or maintained by me. The annual rate of interest which will be charged on net debit balances will be calculated according to the following schedule:

| Debit Balance | Percentage added to the WFI Base Rate* ("Base Rate") | |
|---|---|---|
| $0.01–$9,999.99 | Base Rate plus | 3.00% |
| $10,000–$24,999.99 | Base Rate plus | 2.75% |
| $25,000–$49,999.99 | Base Rate plus | 2.25% |
| $50,000–$99,999.99 | Base Rate plus | 1.75% |
| $100,000–$249,999.99 | Base Rate plus | 1.25% |
| $250,000–$499,999.99 | Base Rate plus | 1.00% |
| $500,000–$999,999.99 | Base Rate plus | 0.875% |
| $1,000,000–$4,999,999.99 | Base Rate plus | 0.75% |
| $5,000,000–9,999,999.99 | Base Rate plus | 0.25% |
| $10,000,000 and above | Base Rate minus | 0.25% |

*  *The Base Rate is set at the discretion of WFI with reference to commercially recognized interest rates, industry conditions relating to the extension of margin credit and general credit market conditions. The Base Rate, in combination with a variable percentage rate based on debit balance, is the rate WFI charges investors to extend credit.*

I understand that the annual rate of interest will change without prior notice to me, in accordance with changes in the WFI Base Rate. With the exception of a credit balance in your short account, all other credit balances in the Brokerage Account and margin accounts are combined and interest is charged to the Margin and Short Account on any resulting debit balance. Interest is computed daily on the debit balance and posts to the account one business day prior to the last business day of the month.

BK04379 (200708117 08/07)



# Margin Disclosure Statement

Wells Fargo Investments, LLC ("WFI"), is furnishing this document to you to provide some basic facts about purchasing securities on margin, and to alert you to the risks involved with trading securities in a margin account. Before trading stocks in a margin account, you should carefully review the margin agreement provided by WFI. Consult us regarding any questions or concerns you may have with your margin accounts.

When you purchase securities, you may pay for the securities in full or you may borrow part of the purchase price from WFI. If you choose to borrow funds from us, you will open a margin account with WFI. The securities purchased are WFI's collateral for the loan to you. If the securities in your account decline in value, so does the value of the collateral supporting your loan, and, as a result, we can take action, such as issue a margin call and/or sell securities in your account, in order to maintain the required equity in the account.

It is important that you fully understand the risks involved in trading securities on margin. These risks include the following:

- **You can lose more funds than you deposit in the margin account.** A decline in the value of securities that are purchased on margin may require you to provide additional funds to WFI that has made the loan to avoid the forced sale of those securities or other securities in your account.

- **WFI can force the sale of securities in your account.** If the equity in your account falls below the maintenance margin requirements under the law, or WFI's higher "house" requirements, we can sell the securities in your account to cover the margin deficiency. You also will be responsible for any shortfall in the account after such a sale.

- **WFI can sell your securities without contacting you.** Some investors mistakenly believe that WFI must contact them for a margin call to be valid, and that WFI cannot liquidate securities in their accounts to meet the call unless WFI has contacted them first. This is not the case. We will attempt to notify our customers of margin calls, but we are not required to do so. However, even if WFI has contacted a customer and provided a specific date by which the customer can meet a margin call, we can still take necessary steps to protect its financial interests, including immediately selling the securities without notice to the customer.

- **You are not entitled to choose which security in your margin account is liquidated or sold to meet a margin call.** Because the securities are collateral for the margin loan, WFI has the right to decide which security to sell in order to protect its interests.

- **WFI can increase its "house" maintenance margin requirements at any time and is not required to provide you with advance written notice.** These changes in WFI policy often take effect immediately and may result in the issuance of a maintenance margin call. Your failure to satisfy the call may cause the member to liquidate or sell securities in your account.

- **You are not entitled to an extension of time on a margin call.** While an extension of time to meet margin requirements may be available to customers under certain conditions, a customer does not have a right to the extension.

**Investment and Insurance Products:**
- Are NOT insured by the FDIC or any other federal government agency
- Are NOT obligations or deposits of or guaranteed by any Wells Fargo Bank or by any Bank affiliate
- Involve investment risk, including possible loss of principal

Wells Fargo Investments, LLC (member SIPC) is a non-bank affiliate of Wells Fargo & Company.



# Business Continuity Disclosure Statement

Wells Fargo Investments, LLC ("WFI" or the "Firm") is providing this document to inform you of its ability to respond to certain business disruptions. WFI is a self-clearing broker/dealer and, as such, it is able to receive and execute securities transactions. Consistent with its business continuity plan, WFI maintains back-up facilities in geographic locations separate from its primary facilities. Using these back-up facilities, the Firm intends to continue its business in the event of a significant business disruption. Nevertheless, there are some disruptions that may render the Firm unable to continue business. Under such circumstances, WFI will ensure that Clients will be able to access their funds and securities within a reasonable time.

To receive up-to-date information during a significant business disruption, Clients may call the Firm's emergency telephone number at 866.281.7438 or visit our emergency information Web page at http://www.wellsfargo.com/investing/why_invest/bcp_alert.jhtml.

The following describes specific disruption events and WFI's intended corresponding general business continuation responses to those events. Clients, however, should note that these responses are subject to modification and, depending on the severity of a specific event, WFI cannot guarantee that it will follow the stated course of action. If these responses are modified, WFI will post the updated disclosure statement on its Web site. In the alternative, Clients may request that the Firm send them, by mail, a copy of the updated disclosure statement.

### A Disruption to a Single Building

This disruption may be caused by physical damage, technology problems, or an inability to have personnel arrive at the office. Because some buildings, such as the home office, are more critical to the Firm's operations, WFI's ability to resume business following a disruption to a specific building depends on the building affected. If the location is unusable, WFI has duplicative systems that will be run from a separate building. The Firm expects only minimal delays from the transfer of operations. If there is a disruption to the home office, WFI expects that operations could be disrupted for up to two (2) hours.

### A Firm-Only Business Disruption

In the event that there is a significant business disruption to the Firm's internal primary systems, WFI will transfer operations to its back-up facilities. In this process, Clients may experience a minor delay in reaching the Firm due to increased telephone calls, technology delays, or other minor difficulties arising from the transfer of operations. WFI expects that any delay will be less than one (1) hour. Nevertheless, the unlikely failure of the telephony system could result in a delay of up to four (4) hours.

### A Business-District, Citywide, or Regional Disruption

In the event that there is a significant business disruption that affects the business district, city, or region where any of the Firm's primary systems are located, WFI will transfer its operations to back-up facilities. In this process, Clients may experience a minor delay in reaching the Firm due to increased telephone calls, technology delays, or other minor difficulties arising from the transfer of operations. WFI expects that any delay will be less than two (2) hours.

BK04379 (200708117 08/07)



# Client Acknowledgement/ Agreement

| | | |
|---|---|---|
| SUB FIRM NO. | ACCOUNT NO. | FC NO. |

ACCOUNT WIZARD REFERENCE NO. (OFFICE USE ONLY)

I/We understand and acknowledge that investments* in my/our Brokerage Account:

**Investment and Insurance Products:**
- ► Are NOT insured by the FDIC or any other federal government agency
- ► Are NOT obligations or deposits of or guaranteed by any Wells Fargo Bank or by any Bank affiliate
- ► Involve investment risk, including possible loss of principal

*See Section I, #4 of the Brokerage Account Agreement.

If applicable, I/we have received a prospectus for the money market mutual fund which is used as the default Money Market Fund Sweep for my/our Brokerage Account or that I/we selected. The prospectus contains detailed information about the fund, including sales charges, management fees, and expenses.

If purchasing Wells Fargo Advantage Funds, I/we understand that Wells Fargo Funds Management, LLC, a wholly-owned subsidiary of Wells Fargo & Company, provides investment advisory and administrative services for the Wells Fargo Advantage Funds. Other affiliates of Wells Fargo & Company provide sub-advisory and other services for the Funds. The Funds are distributed by Wells Fargo Funds Distributor, LLC (member FINRA/SIPC), an affiliate of Wells Fargo & Company.

I/We understand that investments in my/our brokerage account may include third-party funds that pay 12b-1 fees and/or commissions to Wells Fargo Bank, N.A., Wells Fargo Investments, LLC or their affiliates. Those fees and/or commissions are described in the prospectus for each fund. I/We authorize Wells Fargo Bank, N.A. and Wells Fargo Investments, LLC to invest assets in such mutual funds pursuant to proper investment instructions from me/us and to accept such fees as part of their compensation for services rendered.

I/We understand that my/our investment in *Wells Fargo Advantage Funds* and other mutual funds may be subject to front-end or back-end (CDSC) sales charges. The prospectus contains detailed information about the sales charge, as well as other fees and expenses, if applicable.

I/We understand and agree to the following:

1. I/We have read and understand the terms and conditions of the Brokerage Account Agreement and I/we agree to be bound by them.

2. I/We certify that the information provided to you is true, complete and correct.
   I/We will promptly notify you of any changes to this information.

3. Under penalty of perjury, I/we certify that:

   (a) the number provided at right is my correct Social Security Number or taxpayer identification number, and

   (b) I/We are not subject to backup withholding either because (i) I/we have not been notified by the Internal Revenue Service that I/we are subject to backup withholding as a result of a failure to report all interest or dividends, or (ii) the IRS has notified me that I/we are no longer subject to backup withholding.

   *(Cross out Item "b," if you have been notified by the IRS that you are subject to backup withholding because of underreporting of interest or dividends and if you have not received notice from the IRS that such backup withholding has been terminated.)*

   (c) I/We are U.S. person(s) (including a U.S. resident alien(s)) and are of legal age in my/our state of residence.

| | | |
|---|---|---|
| SOCIAL SECURITY NO. | | |
| TAX ID NO. | | |

4. I/We understand that my/our Brokerage Account, if approved for margin trading, will be opened as a margin account. I/We understand that if we do not want to use margin privileges, I/we can do so by not creating a debit in my/our account. If I/we use margin privileges, I/we give WFI permission, without notice to me/us, to pledge and hypothecate my/our securities and other property, separately or together with assets of other margin clients, as collateral for any outstanding loans I/we may have from you at that time.

5. BY SIGNING BELOW, I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THE WELLS FARGO INVESTMENTS BROKERAGE ACCOUNT AGREEMENT WHICH CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE IN SECTION 15, PAGE 3. MY SIGNATURE ALSO ACKNOWLEDGES THAT I HAVE READ AND UNDERSTAND THE DISCLOSURES STATED ABOVE.

6. The Internal Revenue Service does not require your consent to any provision of the document other than the certifications required to avoid backup withholding.

| | |
|---|---|
| CLIENT'S SIGNATURE | DATE |
| JOINT TENANT'S SIGNATURE | DATE |

| | |
|---|---|
| CLIENT'S NAME (Print) | JOINT TENANT'S NAME (Print) |

BK04379 (200708117 08/07)

PAGE 6/6 * RCVD AT 1/23/2008 12:57:51 PM [Mountain Standard Time] * SVR:HS1252RFCOL1/4 * DNIS:3175 * CSID: * DURATION (mm-ss):01-36

WELLS FARGO INVESTMENTS

## Client Acknowledgement/ Agreement

| 1 | 0 | 0 | 1 | 4 | 5 | 0 | 9 | 1 | 9 | 4 | 2 | E | B | T | D |

SUB FIRM NO.          ACCOUNT NO.          FC/IA

ACCOUNT WIZARD REFERENCE NO. (OFFICE USE ONLY)

I/We understand and acknowledge that investments* in my/our Brokerage Account:

> Investment and Insurance Products:
> ➤ Are NOT insured by the FDIC or any other federal government agency
> ➤ Are NOT obligations or deposits of or guaranteed by any Wells Fargo Bank or by any Bank affiliate
> ➤ Involve investment risk, including possible loss of principal

*See Section I, #4 of the Brokerage Account Agreement.

If applicable, I/we have received a prospectus for the money market mutual fund which is used as the default Money Market Fund Sweep for my/our Brokerage Account or that I/we selected. The prospectus contains detailed information about the fund, including sales charges, management fees, and expenses.

If purchasing Wells Fargo Advantage Funds, I/we understand that Wells Fargo Funds Management, LLC, a wholly-owned subsidiary of Wells Fargo & Company, provides investment advisory and administrative services for the Wells Fargo Advantage Funds. Other affiliates of Wells Fargo & Company provide sub-advisory and other services for the Funds. The Funds are distributed by Wells Fargo Funds Distributor, LLC (member FINRA/SIPC), an affiliate of Wells Fargo & Company.

I/We understand that investments in my/our brokerage account may include third-party funds that pay 12b-1 fees and/or commissions to Wells Fargo Bank, N.A., Wells Fargo Investments, LLC or their affiliates. Those fees and/or commissions are described in the prospectus for each fund. I/We authorize Wells Fargo Bank, N.A. and Wells Fargo Investments, LLC to invest assets in such mutual funds pursuant to proper investment instructions from me/us and to accept such fees as part of their compensation for services rendered.

I/We understand that my/our investment in Wells Fargo Advantage Funds and other mutual funds may be subject to front-end or back-end (CDSC) sales charges. The prospectus contains detailed information about the sales charge, as well as other fees and expenses, if applicable.

I/We understand and agree to the following:

1. I/We have read and understand the terms and conditions of the Brokerage Account Agreement and I/we agree to be bound by them.

2. I/We certify that my/our the information provided to you is true, complete and correct. I/We will promptly notify you of any changes to this information.

| 6 | 0 | 9 | 6 | 8 | 1 | 5 | 1 | 4 |

SOCIAL SECURITY NO.

TAX ID NO.

3. Under penalty of perjury, I/we certify that:

   (a) the number provided at right is my correct Social Security Number or taxpayer identification number, and

   (b) I/We are not subject to backup withholding either because (i) I/we have not been notified by the Internal Revenue Service that I/we are subject to backup withholding as a result of a failure to report all interest or dividends, or (ii) the IRS has notified me that I/we are no longer subject to backup withholding.

   (Cross out Item "b," if you have been notified by the IRS that you are subject to backup withholding because of underreporting of interest or dividends and if you have not received notice from the IRS that such backup withholding has been terminated.)

   (c) I/We are U.S. person(s) (including a U.S. resident alien(s)) and are of legal age in my/our state of residence.

4. I/We understand that my/our Brokerage Account, if approved for margin trading, will be opened as a margin account. I/We understand that if we do not want to use margin privileges, I/we can do so by not creating a debit in my/our account. If I/we use margin privileges, I/we give WFI permission, without notice to me/us, to pledge and hypothecate my/our securities and other property, separately or together with assets of other margin clients, as collateral for any outstanding loans I/we may have from you at that time.

5. BY SIGNING BELOW, I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THE WELLS FARGO INVESTMENTS BROKERAGE ACCOUNT AGREEMENT WHICH CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE IN SECTION 15, PAGE 8. MY SIGNATURE ALSO ACKNOWLEDGES THAT I HAVE READ AND UNDERSTAND THE DISCLOSURES STATED ABOVE.

6. The Internal Revenue Service does not require your consent to any provision of the document other than the certifications required to avoid backup withholding.

X _____     01/23/08 _____     _____     _____
CLIENT'S SIGNATURE                DATE                      JOINT TENANT'S SIGNATURE        DATE

_____                                    _____
CLIENT'S NAME (Print)                                      JOINT TENANT'S NAME (Print)

11   WFI Brokerage Account Agreement

BK04379 (200706117 08/07)

JAN. 23. 2008 12:05PM

NO. 4469   P. 6

PLEASE READ AND SIGN. RETURN TO WELLS FARGO INVESTMENTS.

# EXHIBIT B

**Al-Thani v. Wells Fargo & Company, et al.**
**No. CV 08-1745 CW**
**Declaration of Eric G. Wallis re**
**Defendant Wells Fargo's Amended Motion To Compel Arbitration**

May 12 2008 5:59PM    HASSAN LAW FIRM         (415)775-2507          P.1

# HASSAN LAW FIRM

1801 Bush Street, Suite 304, San Francisco, California 94109 Tel: 415.775-9700 Fax: 415.775-2507 reylaw@earthlink.net

May 12, 2008

Via facsimile (510) 273-8832
Via email ewallis@reedsmith.com
Reed Smith, LLP
Eric G. Wallis
1999 Harrison Street, Suite 2400
Oakland, CA 94612

Re:    Al-Thani v. Wells Fargo & Company et. al.
       U.S.D.C. Northern District of California, Case # CV 08-1745

Dear Mr. Wallis:

We are in receipt of your letter dated April 30, 2008 requesting Ms. Al-Thani to stipulate to arbitration and dismiss Wells Fargo and Company.

Your letter enclosed the "agreement" between the parties. This is the first time that either our office or Ms. Al-Thani had possession or viewed the same. The defendants never provided Mrs. Al-Thani with a copy of this "agreement" at any time before or during the investment relationship.

Currently, there are two issues regarding the arbitration clause. We will not to stipulate to arbitration because of the issues we believe are pertinent. The first issue is that the brokerage account was established on January 17, 2008. The arbitration clause that our client purportedly signed was executed on January 23, 2008. Why did the defendants require Ms. Al-Thani to sign a subsequent document? Rather than speculate, suffice to say that many indicators point to sloppy work by the defendants and a clear failure to perform fiduciary duties of explanations of the clause itself; having this foreign lady come in a second time as an after thought does not sit well by any stretch of the imagination and should void any agreement.

The second issue which must be resolved is the validity of the agreement itself, there was no meeting of the minds due to the fraud, mistake, and/or neglect of your clients. Furthermore, the very fact that the agreement was signed a week after the account was open is substantial evidence that Mrs. Al-Thani never knew or did not know that she was giving up a valuable constitutional rights to a jury trial. One who contests an arbitration clause cannot be compelled to arbitrate the threshold issue of the existence of an agreement to arbitrate (citations to follow). Fiduciary duties and failure to explain the meaning of an arbitration clause notwithstanding, the consumer simply cannot be ordered to arbitration without a judicial review of the agreement to the clause itself.

EXHIBIT  B

Plaintiff will not dismiss Wells Fargo & Company because Plaintiff entered into a Wells Fargo Bank, spoke with a Wells Fargo teller, and was sent to speak with a Wells Fargo Investment broker in the same building. These are proofs of facts of apparent and/or ostensible authority. Therefore, Wells Fargo cannot and should not escape responsibility for leaving the consumer with the belief that it is the main entity that is involved in the transaction, having stated that, do provide us with the proper names of entities you believe have responsibility.

We are attaching to this letter the first amended complaint which adds a 14th cause of action. Please feel free to contact either myself or Mark Meuser should you have any questions or comments.

Very Truly Yours,

Rey Hassan

Rey Hassan

Enc. First Amended Complaint