IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHALIE AL-THANI,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>WELLS FARGO & COMPANY; WELLS FARGO INVESTMENTS, LLC; SHALOM MORGAN; DAN HILKEN; and ANDREY MOVSESYAN,<br><br>　　　　Defendants.　　　　　　　　　／ | No. C 08-1745 CW<br><br>ORDER GRANTING MOTION TO COMPEL ARBITRATION, DENYING MOTION FOR LEAVE TO AMEND THE COMPLAINT, GRANTING MOTION TO DISMISS AND GRANTING MOTION TO STAY PROCEEDINGS |

　　　This dispute arises from Plaintiff Nathalie Al-Thani's inability to withdraw funds held in an investment account with Wells Fargo. She charges Defendants with violating the federal securities laws. She also asserts a number of claims under California statutory and common law.

　　　Defendants Wells Fargo Investments, LLC (WFI), Shalom Morgan, Andrey Movsesyan and Dan Hilken (collectively, the WFI Defendants) now move to compel arbitration of Plaintiff's claims against them. Defendant Wells Fargo & Co. (WFC) moves to dismiss the claims against it and, should the motion to compel arbitration be granted, for a stay of this action pending resolution of the arbitration. Plaintiff opposes these motions and seeks leave to amend the complaint to add Wells Fargo Bank, Ltd. (WFB) as a Defendant. The matter was heard on December 18, 2008. Having considered oral

argument and all of the papers submitted by the parties, the Court grants the motion to compel arbitration, denies the motion to amend the complaint, grants the motion to stay and grants the motion to dismiss.

BACKGROUND

I.  The Allegations in the Complaint

The following facts are alleged in the complaint.  In January, 2008, Plaintiff wired $1.75 million into a bank account she held with WFB.[1]  On January 17, she went to a Wells Fargo branch in San Francisco, California and informed a teller that she was interested in purchasing a certificate of deposit (CD) with these funds.  However, when the teller informed her that she would not be able to withdraw any funds from a CD for five months, Plaintiff decided that a CD was not suitable for her needs.  She told the teller that she needed to keep the funds liquid because she intended to use them to purchase a house in the near future.  The teller then introduced Plaintiff to Defendant Morgan, a financial consultant for WFI.  Both WFI and WFB are subsidiaries of WFC.

Mr. Morgan suggested that Plaintiff place her funds in auction rate securities (ARSs).  He said that ARSs were "as safe as a Money Market or Certificate of Deposit" and "were making close to five percent interest."  SAC ¶ 17.  He "claimed that the funds were rated AAA and that they were perfectly safe, and because they were auctioned every week, all [Plaintiff] had to do was notify him on

---

[1] Plaintiff's proposed second amended complaint clarifies the roles played by the various Wells Fargo corporate entities.  In the interest of accurately portraying each entity's involvement in the events giving rise to this action, the Court describes the allegations in the proposed second amended complaint.

2

Wednesday and she could have her money back on Friday." Id. Plaintiff "constantly asked [Mr.] Morgan about the risks" of investing her money in ARSs, and Mr. Morgan "kept telling her" that ARSs were "a perfectly safe way to hold" her funds. Id. He also stated that ARSs "have nothing to do with the stock market," and thus Plaintiff "should not even watch the stock market reports on television, as they are not related" to ARSs. Id. ¶ 18. Based on Mr. Morgan's representations, Plaintiff decided to purchase approximately $1.75 million in ARSs.

On February 6, 2008, Plaintiff informed Mr. Morgan that she needed to liquidate her funds so that she could purchase a house. Mr. Morgan told her that he had "missed the deadline," and thus Plaintiff could not access the funds immediately. Id. ¶ 21. Again on February 13, February 20 and February 27, Plaintiff contacted Mr. Morgan and sought to withdraw her funds. Each time, Mr. Morgan explained that, for one reason or another, the funds could not be liquidated. On March 3, Plaintiff visited the Wells Fargo branch to speak with Mr. Morgan about withdrawing her money. Because Plaintiff "is a French citizen and does not have great knowledge of the United States banking operations," she brought a friend to assist her. Id. ¶ 25. Mr. Morgan informed Plaintiff and her friend at that meeting that "there was a problem with the auction that had never occurred before." Id. Again on March 7, Mr. Morgan told Plaintiff that "the auction did not occur and thus [her] funds could not be liquidated." Id. ¶ 27.

Plaintiff then visited Mr. Morgan's supervisor, Defendant Hilken. Mr. Hilken suggested that Plaintiff send a "friend who had a better understanding of the banking process to speak with Chuck

3

1  Gaggs, a senior officer" of WFB.  Id. ¶ 29.  Plaintiff followed
2  this advice, and Mr. Gaggs told Plaintiff's friend that "Wells
3  Fargo would give [Plaintiff] a line of credit using the money in
4  the auction rate security as collateral."  Id.  This was
5  unacceptable to Plaintiff because she did not want to take out a
6  loan to purchase her house.

7      Although Mr. Morgan told Plaintiff that her funds could not be
8  liquidated because of a problem that had never happened before, in
9  fact, "some auctions for auction rate securities backed by sub-
10 prime debt" had begun to fail as early as the summer of 2007.  Id.
11 ¶ 31.  The number of failures increased during the following fall
12 and winter.  On February 7, 2008, auctions for ARSs "began to fail
13 en masse, due to auction-running banks' refusal to step in to bid
14 on the excess supply."  Id. ¶ 32.  On February 13, 2008, eighty
15 percent of such auctions failed due to investors' concerns about
16 credit risks.

17     Plaintiff claims that Defendants "knew or should have known of
18 the volatility and risks" associated with ARSs, yet "continued to
19 encourage investors," including Plaintiff, to purchase them.  Id.
20 ¶ 31.  In doing so, they represented to investors "that these
21 securities were the same as cash or money markets" in that they
22 were highly liquid and safe for short-term investing.  Id.  They
23 did not disclose any "of the risks associated with the securities,"
24 including "the risk of losing the investment itself."  Id.

25     Plaintiff makes no specific allegations in the complaint
26 against Defendant Movsesyan.  He apparently is being sued because
27 his name appears along with Mr. Morgan's on a transaction
28 confirmation.  See id. ¶ 10.

4

1  II.  The Arbitration Agreement

2       Defendants have submitted a declaration from Mr. Morgan in
3  which he states that he provided Plaintiff with a copy of WFI's
4  Brokerage Account Agreement, an eleven-page document, when the two
5  of them first met on January 11, 2008.[2]  He allegedly advised
6  Plaintiff that, if she chose to open an account with WFI, she would
7  need to sign a form entitled "Client Acknowledgement / Agreement."
8  This form comprises the last page of the Brokerage Account
9  Agreement.  It contains a clause that states, "I/We have read and
10 understand the terms and conditions of the Brokerage Account
11 Agreement and I/we agree to be bound by them."  Morgan Dec. Ex. A
12 at 11.  It also contains a clause that states, "BY SIGNING BELOW,
13 I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THE WELLS FARGO INVESTMENTS
14 BROKERAGE ACCOUNT AGREEMENT WHICH CONTAINS A PRE-DISPUTE
15 ARBITRATION CLAUSE IN SECTION 15, PAGE 3.  MY SIGNATURE ALSO
16 ACKNOWLEDGES THAT I HAVE READ AND UNDERSTAND THE DISCLOSURES STATED
17 ABOVE."  Id.  This is the only clause on the form that is written
18 in all-capital letters.

19      Section 15 of the Brokerage Account Agreement states in part:

> I AGREE THAT ALL CLAIMS, CONTROVERSIES AND OTHER DISPUTES
> BETWEEN ME AND WELLS FARGO INVESTMENTS AND ANY OF ITS
> DIRECTORS, OFFICERS, EMPLOYEES, OR AGENTS ARISING OUT OF
> OR RELAT[ING] TO THE BROKERAGE ACCOUNT OR ANY ORDERS OR
> TRANSACTIONS THEREIN OR THE CONTINUATION, PERFORMANCE OR
> BREACH OF THE BROKERAGE ACCOUNT AGREEMENT OR ANY OTHER
> AGREEMENT BETWEEN YOU AND ME, WHETHER ENTERED INTO
> BEFORE, ON, OR AFTER THE DATE THIS ACCOUNT IS OPENED,
> SHALL BE DETERMINED BY ARBITRATION CONDUCTED BY, AND
> SUBJECT TO THE ARBITRATION RULES THEN IN EFFECT OF THE
> FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.

---

[2] As noted above, the complaint alleges that Plaintiff first visited the Wells Fargo branch on January 17, 2008.  Plaintiff admits in a declaration, however, that her first visit was actually on January 11.

Id. at 3-4.  The remainder of Section 15 is written entirely in all-capital letters as well.  Only one other provision in the Agreement is written in all-capital letters: a portion of Section 29, which deals with research reports.

Mr. Morgan states in his declaration that Plaintiff left the bank without signing the "Client Acknowledgement / Agreement" form.  He nonetheless opened an account in her name.  On January 14, $1.75 million was transferred from Plaintiff's bank account to her new investment account.  Mr. Morgan asserts that, during the week following Plaintiff's initial visit to the bank, she called him "to continue [their] conversation about investments including securities known as auction market preferred shares."  Morgan Dec. ¶ 7.  It is not clear whether Mr. Morgan alleges that the conversation took place during a single telephone call or over the course of multiple calls.  In any event, he states that Plaintiff eventually asked him to purchase $1.75 million worth of ARSs.  The securities were purchased on January 17.

Mr. Morgan states that he told Plaintiff during a telephone conversation that she would need to sign the Brokerage Account Agreement, which she had neglected to do during her visit to the bank.  Plaintiff allegedly agreed, but her schedule would not permit her to meet with Mr. Morgan until January 23.  Mr. Morgan states that, during the January 23 meeting, he handed Plaintiff the "Client Acknowledgement / Agreement" form and explained that it was the signature page for the Brokerage Account Agreement.  Plaintiff signed the document without asking any questions and without asking for a copy of either the full agreement or the acknowledgment form itself.

6

Plaintiff has submitted her own declaration concerning the matters addressed by Mr. Morgan. Her account of events differs in certain respects from that of Mr. Morgan. She asserts that there was "no discussion of contract, legal document and/or agreement" during her initial meeting with Mr. Morgan, and that he did not give her "any document or piece of paper to take with [her] and/or read." Pl.'s Dec. ¶¶ 14-15. Plaintiff alleges that, after her first visit to the bank, she spoke with Mr. Morgan about ARSs again in a telephone conversation on January 14 or 15. However, she asserts that "there was no discussion of contract, and/or signing of any document." Id. ¶ 19. She also asserts that, during the conversation, Mr. Morgan "never mentioned that he had established the account for [her] or transferred funds from [her] bank account." Id. ¶ 20.

According to Plaintiff, she received another phone call from Mr. Morgan on January 21 or 22. During that call, he told her "to come to the Wells Fargo Bank branch and sign some documents to establish the account [and] transfer funds." Id. ¶ 21. She went to the branch on January 23 and met with Mr. Morgan. During the meeting, he allegedly presented her "with a piece of paper and demanded that [she] sign" it. Id. ¶ 23. Plaintiff maintains that Mr. Morgan "did not show [her] that [she] was signing a 12-page document; he only showed [her] a single page and told [her] to sign at the bottom." Id. ¶ 23. She "did not read the document because Mr. Morgan told [her] it was necessary to document [sic] related to [her] account." Id. ¶ 23. Plaintiff claims that she does "not read English that well" and, "believing Mr. Morgan," she signed the document. Id. § 24. According to Plaintiff, Mr. Morgan did not

7

tell her that the document "was an Acknowledgement of the Brokerage Account Agreement" or that "the Brokerage Account Agreement contained an arbitration clause." Id. ¶ 25.  Nor did he inform Plaintiff that he had already established an account for her and invested her funds in ARSs.

Plaintiff alleges that no one provided her with a copy of the Brokerage Account Agreement until she received one from her attorneys during the course of this lawsuit.  She maintains that, if Mr. Morgan had provided her with a copy of the agreement, she "would have read the document, sought appropriate counsel, and would probably have decided not to entrust the [sic] either Mr. Morgan or Wells Fargo Bank with [her] money since the Brokerage Account Agreement makes clear that [she] was investing [her] money and that there would be risk to losing some or all of the money necessary to purchase a house." Id. ¶ 29.  Plaintiff also states that she speaks English "on a conversational level", but does "not understand the technical nuances of the English language." Id. ¶ 30.  Her understanding of English is "even more limited when [she] must read documents in English." Id. ¶ 31.

LEGAL STANDARD

I.   Motion to Compel Arbitration

Under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., written agreements that controversies between the parties shall be settled by arbitration are valid, irrevocable, and enforceable. 9 U.S.C. § 2.  A party aggrieved by the refusal of another to arbitrate under a written arbitration agreement may petition the district court which would, save for the arbitration agreement, have jurisdiction over that action, for an order directing that

8

arbitration proceed as provided for in the agreement.  9 U.S.C. § 4. The FAA further provides that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

9 U.S.C. § 3.

If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." Id.  The FAA reflects a "liberal federal policy favoring arbitration agreements." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25 (1991) (quoting Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).  A district court must compel arbitration under the FAA if it determines that: 1) there exists a valid agreement to arbitrate; and 2) the dispute falls within its terms. Stern v. Cingular Wireless Corp., 453 F. Supp. 2d 1138, 1143 (C.D. Cal. 2006) (citing Chiron Corp. v. Ortho Diagnostic Sys., 207 F.3d 1126, 1130 (9th Cir. 2000)).

II.  Motion to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of

a legally cognizable claim and the grounds on which it rests. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).

When granting a motion to dismiss, the court is generally required to grant the plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990). In determining whether amendment would be futile, the court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint." Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990). Leave to amend should be liberally granted, but an amended complaint cannot allege facts inconsistent with the challenged pleading. Id. at 296-97.

DISCUSSION

I. Motion to Compel Arbitration

Plaintiff argues that the Court should not compel arbitration for two reasons. First, she argues that she did not agree to arbitrate the present dispute. Second, she argues that, even if she did make such an agreement, enforcing it would be unconscionable.

A. Agreement to Arbitrate the Present Dispute

Plaintiff argues that no agreement to arbitrate exists because 1) she did not intend to agree to the arbitration provision when

10

1  she signed the "Client Acknowledgement / Agreement" form; 2) she
2  did not sign the form until after her account had already been
3  opened and the ARSs purchased; and 3) she did not receive a copy of
4  the Brokerage Account Agreement prior to signing the acknowledgment
5  form.  She also argues that, even if an agreement was formed, it
6  does not extend to the present dispute and is not enforceable
7  because it is not in writing.
8      "When deciding whether the parties agreed to arbitrate a
9  certain matter . . . courts generally . . . should apply ordinary
10 state-law principles that govern the formation of contracts."
11 First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).
12 Under California law, determining the existence of "[m]utual assent
13 to contract is based upon objective and outward manifestations of
14 the parties; a party's 'subjective intent, or subjective consent,
15 therefore is irrelevant.'"  Stewart v. Preston Pipeline Inc., 134
16 Cal. App. 4th 1565, 1587 (2005) (quoting Beard v. Goodrich, 110
17 Cal. App. 4th 1031, 1040 (2003)).  Plaintiff's signature on the
18 "Client Acknowledgement / Agreement" form is objective evidence of
19 her assent to its terms.  Marin Storage & Trucking, Inc. v. Benco
20 Contracting and Eng'g, Inc., 89 Cal. App. 4th 1042, 1049 (2001)
21 ("[O]rdinarily one who signs an instrument which on its face is a
22 contract is deemed to assent to all its terms.").  Her testimony
23 about her subjective intent in signing the agreement has no bearing
24 on whether she is bound by it.  Nor is it relevant that she did not
25 read the document before signing it or, if she had read it, that
26 she may not have fully understood the significance of its language.
27 Id. ("A party cannot avoid the terms of a contract on the ground
28 that he or she failed to read it before signing."); Stewart, 134

11

Cal. App. 4th at 1587 ("Plaintiff's opposition -- based upon nothing more than his claim that he had not read or understood the agreement before signing it -- raised no triable issue on the question of mutual assent.").

Plaintiff places great weight on the fact that she did not sign the acknowledgment form until after her account had been opened. She argues generally that interpreting a contract so as to impose retroactive obligations is disfavored. However, the Brokerage Account Agreement placed no retroactive obligation on Plaintiff. By signing the acknowledgment form, she explicitly agreed to be bound by the arbitration provision in the Brokerage Account Agreement, thereby undertaking a <u>prospective</u> obligation to arbitrate, rather than litigate, any claims relating to her existing account. If she had chosen not to sign the form and did not otherwise manifest assent to the arbitration provision, she would not have been bound to arbitrate disputes related to her existing account.

Plaintiff also emphasizes that she was not given a copy of the Brokerage Account Agreement until after she had already signed the acknowledgment form. But she fails to demonstrate that this fact is legally significant. The acknowledgment form clearly states that the signatory acknowledges receipt of the Brokerage Account Agreement and agrees to be bound by its terms. If Plaintiff had not received the agreement and was concerned about being bound to terms she had not read, she could have asked to see it before signing it.

Plaintiff argues that the acknowledgment form does not specify which disputes are subject to arbitration, and thus the arbitration

12

provision cannot be applied to this action.  This argument ignores the actual arbitration provision in the Brokerage Account Agreement, by which Plaintiff agreed to be bound.  It is clear that the scope of this provision extends to Plaintiff's claims against the WFI Defendants -- the claims certainly "relate" to her brokerage account -- and Plaintiff does not argue otherwise.

Plaintiff also argues, inexplicably, that there is no written agreement to arbitrate.  The existence of a written arbitration agreement is a requirement under the FAA.  9 U.S.C. § 2.  But Plaintiff signed a written acknowledgment form agreeing to the terms of a written account agreement.  Both the signed form and the account agreement are attached as exhibits to the Morgan Declaration.

The Court finds that the parties entered into an agreement to arbitrate Plaintiff's claims against the WFI Defendants.  Accordingly, the Court must determine whether the agreement is unconscionable.

B.   Unconscionability

"[G]eneral contract defenses such as fraud, duress or unconscionability, grounded in state contract law, may operate to invalidate arbitration agreements."  Circuit City Stores v. Adams, 279 F.3d 889, 892 (9th Cir. 2002).  Under California law, "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."  Cal. Civ. Code § 1670.5(a).

13

Unconscionability has both a procedural and a substantive component. Both components must be present before a court may refuse to enforce a contract. Armendariz v. Found. Health Psychcare Servs., 24 Cal. 4th 83, 114 (2000). However, they need not be present to the same degree; "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." Id.

A contract is procedurally unconscionable if it is a contract of adhesion. Circuit City, 279 F.3d at 893 ("The [arbitration agreement] is procedurally unconscionable because it is a contract of adhesion."); see also Flores v. Transamerica Homefirst, Inc., 93 Cal. App. 4th 846, 853 (2002) ("A finding of a contract of adhesion is essentially a finding of procedural unconscionability."). A contract of adhesion is a "standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." Armendariz, 24 Cal. 4th at 113 (quoting Neal v. State Farm Ins. Co., 188 Cal. App. 2d 690, 694 (1961)).

Here, the Brokerage Account Agreement is a standard form agreement required of all WFI account-holders. It was drafted by the party with superior bargaining strength, and was offered on a take-it-or-leave-it basis, with no opportunity for Plaintiff to negotiate its terms. It is therefore a contract of adhesion and is procedurally unconscionable. In addition, accepting the truth of Plaintiff's allegations, the agreement is procedurally unconscionable to a greater degree than most contracts of adhesion. It was not presented to her before her account was opened, and thus

14

she was forced either to accept the agreement or, implicitly, close her account.  In addition, Plaintiff alleges that she was not presented with the full account agreement and given the opportunity to read it at her leisure before she signed the acknowledgment form.  This further contributes to the agreement's procedural unconscionability.

Defendants do not dispute that the agreement is procedurally unconscionable, but correctly note that, under California law, a contract is enforceable, no matter how great the degree of procedural unconscionability, unless it is also substantively unconscionable.  Substantive unconscionability focuses on the harshness and one-sided nature of the terms of the contract.  A & M Produce Co. v. FMC Corp., 135 Cal. App. 3d 473, 486-87 (1982).  An adhesive agreement to arbitrate will satisfy this general standard for substantive unconscionability if the agreement lacks a "modicum of bilaterality."  Armendariz, 24 Cal. 4th at 117.  Whether an arbitration agreement is sufficiently bilateral is determined by an examination of the actual effects of the challenged provisions.  Ellis, 18 Cal. App. 4th at 1803 ("Substantive unconscionability . . . refers to an overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was made.") (internal quotation marks omitted).

Plaintiff makes the conclusory assertion that the arbitration provision is substantively unconscionable, but she fails to discuss any term of the provision, let alone demonstrate that the terms are one-sided and harsh.  Plaintiff's argument, while purporting to demonstrate substantive unconscionability, focuses exclusively on the circumstances surrounding the opening of Plaintiff's account

15

and her acceptance of the account agreement. These issues go to procedural unconscionability. Plaintiff has not even attempted to show that the arbitration proceedings that are compelled by the agreement lack a modicum of bilaterality.

Because the arbitration agreement is not substantively unconscionable, it is valid and must be enforced. Pursuant to the FAA, proceedings against the WFI Defendants will be stayed pending resolution of the arbitration.

II. Motion to Amend the Complaint

Plaintiff moves to amend the complaint to add WFB as a Defendant. The proposed second amended complaint asserts claims against WFB for breach of fiduciary duty, conversion and negligence. These claims are based on WFB's referral of Plaintiff to WFI for investment advice even though it knew of her desire to keep her funds liquid.

Although Plaintiff's claims against WFB may not be subject to the arbitration provision that governs disputes related to her account with WFI, WFB's liability is nonetheless likely to turn on the liability of WFI and its employees. Accordingly, it would not be desirable to proceed with any of the proposed claims against WFB until the arbitration of Plaintiffs' claims against the WFI Defendants has been completed. Accordingly, Plaintiff's motion is denied without prejudice to re-filing, if appropriate, once the arbitration is completed.

III. WFC's Motion to Dismiss and Motion to Stay

The first amended complaint asserts fourteen causes of action, but does not specify against whom each cause of action is

16

asserted.³  The proposed second amended complaint rectifies this problem.  It asserts only one claim against WFC, for violating § 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder.  WFC's liability is premised on its serving as a "control person" of the WFI Defendants.

Section 20(a) of the Exchange Act provides, "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).  To prove a prima facie case under § 20(a), a plaintiff must prove: 1) "a primary violation of federal securities law"; and 2) "that the defendant exercised actual power or control over the primary violator."  Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).  "[I]n order to make out a prima facie case, it is not necessary to show actual participation or the exercise of power; however, a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation."  Id.  "Whether [the defendant] is a controlling person is an

---

³Plaintiff's opposition to WFC's motion does not clarify the matter.  She admits that WFC is not a proper Defendant for "a variety of the causes of action," but does not specify which ones.  She goes on to argue generally that each of her causes of action states a viable claim, but she does not argue that each cause of action states a claim against WFC, even though WFC is the only Defendant who has filed a motion to dismiss.

17

intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." Id.

The complaint does not allege any specific facts supporting a conclusion that WFC is a controlling person of the WFI Defendants. The entirety of the relevant allegations is contained in the following paragraphs:

> The control person Defendant acted as a controlling person of the investment adviser within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their operational and management control of the investment adviser respective businesses and systematic involvement in the fraudulent scheme alleged herein, the control person defendant had the power to influence and control and did influence and control, directly or indirectly, the decision making and actions of the investment adviser, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The control person Defendant had the ability to prevent the issuance of the statements alleged to be false and misleading or could have caused such statements to be corrected.
>
> In particular, the control person Defendant had direct and supervisory involvement in the operations of the investment adviser and, therefore, is presumed to have had the power to control or influence the particular transaction giving rise to the securities violations as alleged herein, and to have exercised same.

FAC ¶¶ 46-47.[4]  These paragraphs consist of bare legal conclusions and are devoid of any factual underpinnings.  Accordingly, the complaint does not state a claim against WFC.

It is possible that Plaintiff could amend the complaint so as to allege facts sufficient to support the conclusion that WFC was a control person within the meaning of § 20(a).  However, even if she did, WFC's liability would be premised on the liability of the WFI

---

[4] The relevant allegations in the proposed second amended complaint are identical to those in the first amended complaint.

Defendants for violating § 10(b) and Rule 10b-5. Because the liability of the WFI Defendants will be determined by arbitration, the Court will not permit amendment at this time. Following the conclusion of arbitration proceedings, Plaintiff may move to amend the complaint if doing so would be appropriate given the outcome. In the meantime, these proceedings will be stayed in their entirety.

## CONCLUSION

The WFI Defendants' motion to compel arbitration (Docket No. 35) is GRANTED. Plaintiff's motion to amend the complaint (Docket No. 42) is DENIED without prejudice. WFC's motions to dismiss and to stay proceedings (Docket No. 33) are GRANTED. The claim against WFC is dismissed with leave to amend once the arbitration is completed. The case is stayed pending arbitration, which must be diligently pursued. A case management conference will be held on December 8, 2009 at 2:00 p.m. If the arbitration is completed before that time, the parties must file a joint status report and case management statement within ten days of its completion. The Court will then advance the case management conference as needed.

IT IS SO ORDERED.

Dated: 1/7/09

CLAUDIA WILKEN
United States District Judge